648

UNITED STATES of America, for the Use of ARC & GAS WELDER ASSOCIATES, INC.,

v.

Winton M. BLOUNT, William H. Blount and Clara B. Blount, partners, trading as Blount Brothers Construction Co., and United States Fidelity & Guaranty Company, Defendants and Third-Party Plaintiffs (GREEN FUEL ECONO-MIZER COMPANY, Inc., a New York corporation, and National Surety Corporation, Third-Party Defendants).

ARC & GAS WELDER ASSOCIATES, INC., a Maryland corporation,.

v.

GREEN FUEL ECONOMIZER CO., Inc., a New York corporation,

and

National Surety Corporation, a New York corporation.

GREEN FUEL ECONOMIZER CO., Inc., Defendant and Third-Party Plaintiff,

v.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Joseph T. Ryerson and Son, Inc., and Winton M. Blount, William H. Blount and Clara B. Blount, Partners trading as Blount Brothers Construction Company, Third-Party Defendants.

Civ. Nos. 11141, 11142.

United States District Court
D. Maryland.
April 7, 1960.

John Henry Lewin, David C. Green and Venable, Baetjer & Howard, Baltimore, Md., for Arc & Gas Welder Associates, Inc.

William L. Marbury, Mathias J. DeVito and Piper & Marbury, Baltimore, Md., and James C. Blair, Birmingham, Ala., for Blount Brothers Construction Co. and United States Fidelity & Guaranty Company.

Byron N. Scott and Frank S. Ketcham, Washington, D. C., for Green Fuel Economizer Company, Inc., and National Surety Corporation.

William B. Somerville, Baltimore, Md., and E. H. Cushman, Philadelphia, Pa., for American Casualty Company of Reading, Pa.

THOMSEN, Chief Judge.

These consolidated cases arise out of the construction of a biological laboratory at Fort Detrick, Frederick, Maryland. The Corps of Engineers, Department of the Army, was in charge of the construction. The laboratory includes two "cloud chambers", air-tight rooms of stainless steel, polished to so smooth a finish that there are no pits, cracks or crevices in which germs may lurk after the cloud chambers have been emptied and cleaned from time to time.

The general contract for the laboratory was let to Blount Brothers Construction Company (Blount), which subcontracted the furnishing of all work and materials for the cloud chambers to Green Fuel Economizer Company, Inc. (Green). Green, in turn, ordered the steel from Ryerson Steel Company (Ryerson), and contracted with Arc & Gas Welder Associates, Inc. (Arc) to do the welding, fabricating, erecting and testing, and to polish the welds.

Gordon, who was in charge of the cloud chamber job for Green, was continually scheming to develop claims for extra work against Blount and the Government. He also induced Knief, the president and sole stockholder of Arc, who was inexperienced and unsophisticated, to do a great deal of polishing which was not required of Arc by its sub-subcontract with Green, but was required of Green by its subcontract with Blount. The work was finally completed, at great cost to Arc. The consolidated cases, which have been tried before the court without a jury, involve:

I. (A) Claims by Arc against Green

(1) for the retained percentage,

(2) for additional work, principally polishing, ordered by Green, or made necessary by the condition of the steel plates purchased by Green from Ryerson, or for which Green would be otherwise liable.

(B) Claims by Arc against Blount and its Surety

(1) for work ordered by Blount, and

(2) under the Miller Act, 40 U.S.C.A. §§ 270a–270d, for the same items embraced in Arc's claims against Green, I.(A) (1) and (2).

II. (A) Claims by Green against Blount and Blount's Surety

(1) for the retained percentage,

(2) the so-called "plate claim", and

(3) the so-called "polishing claim", which is chiefly an indemnity claim for any amount payable by Green to Arc under I.(A) (2).

(B) Claim by Green against Blount for wilful interference with and malicious failure to convey certain information to Green.

(C) Claim by Green against Arc and Arc's Surety for delay. This claim was dismissed with prejudice by Green as against Arc's Surety during the trial, without any payment to Green by Arc's Surety.

(D) A claim by Green against Ryerson was part of the case until shortly before the trial, when it was dismissed by Green with prejudice. There is nothing in the record to show what, if anything, Ryerson paid to obtain this dismissal.

III. Claims by Blount against Green and Green's Surety

(A) for delays chargeable to Green,

(B) for exoneration from and indemnity against Arc's Miller Act claim against Blount, I.(B) (2), above, and

(C) for counsel fees.

In addition to the contracts, plans, specifications, physical exhibits, records, bills, computations, etc., the parties offered hundreds of letters and over 2,000 pages of testimony. Arc, Green and Blount have each submitted over fifty proposed findings of fact, many very elaborate, some covering several typewritten pages. It is impractical to rule on all the proposed findings; the important facts are set out below in the two major sections of this opinion, headed "Underlying Facts" and "Findings of Fact and Conclusions of Law on the Several Claims".

### Underlying Facts

(1) The General Contract (U. S.-Blount)

On June 30, 1955, Blount entered into a general contract with the Corps of Engineers to construct a biological laboratory, including two cloud chambers, at Fort Detrick, Maryland, for the Chemical Corps (the Using Agency). As required by the Miller Act, 40 U.S. C.A. § 270a, Blount furnished a payment bond, with United States Fidelity and Guaranty Company (U.S.F. & G.) as surety, in the penalty of $1,677,700.

The outer walls of the cloud chambers were to be constructed of stainless steel plates, $3/16$ths of an inch thick, welded together, and supported by carbon steel structural beams tack-welded to the outside of the plates. Each cloud chamber contained a vertical baffle, to be constructed of welded stainless steel sheets,[1] and a horizontal baffle, of welded stainless steel plates.

The following provisions of the specifications are particularly pertinent:

"8–06 f. (1) All welds in the Cloud Chambers, Dissemination Room, Dressing Room E, and Air Lock No. 4 shall be ground smooth, and where No. 4 finish is hereinafter specified, shall be ground substantially flush with parent metal surfaces."

"8–06 f. (3) Inside Cloud Chambers 'A' and 'B', all stainless steel surfaces, including weld metal surfaces, shall be polished to a No. 4 finish without pits, cracks, or crevices. No. 4 finish shall include both faces and all exposed edges of baffle sheets and all exposed surfaces of baffle-supporting or reinforcing members."

"8–06 j. *Final Polishing:* Immediately prior to completion of the contract work, stainless steel surfaces with No. 4 finish shall be given a final recheck for pits, cracks, and crevices, and a final polishing."

(2) No. 4 Finish

Surface finishes on stainless steel sheet and plate are commonly sold by number designations, e. g. No. 1 finish, No. 4 finish, and No. 7 finish, the higher numbers indicating smoother finishes. They are not customarily sold in terms of a measurable smoothness in micro-inches. No. 1 finish, sometimes called "mill finish", is not polished at all. The leading steel mills regularly produce and sell stainless steel sheet and plate designated as having a No. 4 finish.

It is understood in the industry that a No. 4 finish is a finish arrived at by grinding the surface of the plate or sheet with coarse abrasives and then polishing the surface with abrasives no coarser than 120 grit. Some mills use an even finer grit, but 120 grit is standard. While the various mills do not achieve precisely the same surface smoothness for all No. 4 finish and do not ordinarily produce or sell No. 4 finish in terms of a micro-inch measure or other specific measure of surface smoothness, the No. 4 finishes produced

---

1. In the steel industry, thicknesses of $3/16''$ and greater are known as "plate", and thicknesses of less than $3/16''$ as "sheet".

and sold by the various reputable mills fall within a range of surface smoothness which does not exceed 42 microinches. It is also recognized in the industry that to qualify as a No. 4 finish the surface of the plate must have no pits visible to the naked eye, and that all such pits are to be removed in the grinding and polishing operations necessary to produce a merchantable No. 4 finish.

There is no material difference between a No. 4 finish on plate that has been polished to that finish by a mill and on plate that has been polished to that finish in the field, except that field-polished plate may be streaked in appearance. Nor is there any material difference between a No. 4 finish on stainless steel plate and a No. 4 finish on stainless steel sheet, although they may not look the same at a casual glance.

(3) The Subcontract (Blount-Green)

On July 28, 1955, Blount entered into a subcontract with Green, in which Green agreed that it would furnish all labor, materials, equipment, etc., and would perform all work necessary to furnish, erect and complete two stainless steel cloud chambers in all respects as was required of Blount by the general contract, including the plans and specifications.

With certain limitations, the contract documents allowed the contractor to choose the details of the method of fabrication and erection.

It was agreed, however, that all work would be done under the direction of the Corps of Engineers, which was designated as the Engineer and/or Architect, and that its decision as to the true construction and meaning of the drawings and specifications would be final.

Green agreed to prosecute its work efficiently and promptly, and not to delay the work carried on by Blount or by other subcontractors. If Green was delayed by Blount, Green would be entitled only to an extension of time.

During the course of the work, progress payments were to be made by Blount to Green based upon estimates made by the Corps of Engineers, with the option in Blount to retain 10% of each estimate until final settlement and to withhold payment of any estimate until Green furnished suitable evidence that it had paid in full for all labor, materials and supplies used in its work through the date of the estimate.

Green and National Surety Corporation (National) executed and delivered to Blount a surety bond guaranteeing that Green would perform the subcontract and all duly authorized modifications thereof, and would make prompt payment to all persons furnishing labor, services and materials for use in the prosecution of the work covered by said contract.

(4) Developments through May, 1956.

Before entering into the subcontract with Blount, Green had solicited and received proposals from several steel mills for furnishing mill-polished plate having a No. 4 finish; after entering into the subcontract, Green placed an order with Armco Steel Corporation for such plate.

On November 11, 1955, Green entered into an agreement with Donald F. Gordon, under which Gordon took full charge of the administration of the subcontract with Blount and was to receive any profit made thereon. Shortly thereafter, that agreement was superseded by an arrangement whereby Gordon still had full charge of the administration of the subcontract, but was to be compensated by a salary from Green. On December 7, 1955, Gordon canceled the Armco order, telling an officer of Green that he preferred to purchase the polished plates from Eastern Stainless Steel Corporation rather than from Armco.

Gordon considered various methods of performing the work; e. g. he considered the possibility of purchasing plate with a No. 1 finish, to be polished in the field rather than at the mill, but abandoned that idea.

In January 1956, Gordon proposed to furnish plates having a so-called "pack-roll" finish as a substitute for plates polished to a No. 4 finish. Green offered to reduce the contract price by $370 if permitted to make this substitution. Permission was refused by the Corps of Engineers, one of the reasons for the refusal being that the removal of the pits inherent in pack-roll plate would require such extensive grinding that the plate would be less than the specified 3/16" thick in some areas. The Resident Engineer wrote Blount: "You are requested, therefore, to make this installation of stainless steel polished to a No. 4 finish. Representative samples of the finish to be furnished should be forwarded to this office immediately." Blount transmitted a copy of the letter to Green and asked Green to submit samples "with the No. 4 finish". Blount's superintendent, Messigner, said: "As you know, there is (sic) no 2 manufacturers that agree on what a No. 4 finish is". (However, I have found, Underlying Facts (2), supra, that a No. 4 finish *does* have a definite meaning in the steel industry.)

Later, Gordon proposed the use of "pack-roll" plates, to be polished to a No. 4 finish in the field, and submitted a sample, but admitted that it would not be possible to duplicate that finish exactly in the field.[2] The Corps of Engineers examined the sample submitted by Green and found that it measured about 55 *micro-inches* and that it had many pits. Therefore, on May 14, 1956, the Resident Engineer wrote Blount rejecting the sample, and said that "a surface finish similar or equal to that provided by the United States Steel Corporation as their stock No. 4 finish is considered acceptable by the Using Agency". The United States Steel Corporation does not advertise a "stock No. 4 finish". However, the adjective

"stock" was evidently used by the Resident Engineer to mean regular or standard, and it is clear that U. S. Steel regularly advertised and sold a standard No. 4 finish similar to the No. 4 finish sold by other mills, i. e. a finish achieved by polishing with 120 grit, and without pits visible to the naked eye.

On May 15, Blount wrote Green, enclosing a copy of the May 14 letter from the Corps of Engineers and saying: "It is very important that you submit to this office another sample that you think is equal to U. S. Steel Corporation's stock No. 4 finish."

Meanwhile, on May 3, Green had requested a quotation from Ryerson Steel Company on mill-polished plate with a No. 4 finish; the request for such quotation stated that it was a "revised and final" plate list. On May 8 Ryerson sent Green the requested quotation. After receipt of Blount's letter of May 15, Green, without protest to Blount or to the Corps of Engineers, placed an order with Ryerson for the plates, on the basis of the quotation previously obtained. Green added the following note to its order: "Corps of Engineers has attached memo to recent correspondence requesting a No. 4 finish comparable to 'U. S. Steel Corporation Stock No. 4 Finish'. This will apply to this order." The addition of this note did not increase the price which Ryerson charged Green. Ryerson, in turn, ordered from Allegheny-Ludlum Steel Co. mill-polished plates having a No. 4 finish "equivalent" to United States Steel Corporation's stock No. 4 finish, and that order was accepted in June, 1956. Ryerson later certified that the plates had a No. 4 finish, although in fact they did not have a No. 4 finish.

*(5) The Sub-contract (Green-Arc)—*
*Summer 1956 to November 1956.*

Royal R. Knief was a distributor of welding machines, appliances and materials. He had formerly been a weld-

---

**2.** It is noteworthy that no more than a month before submitting that sample, Gordon had given instructions to abandon preparation of working shop draw-

ings calling for the use of pack-roll plates, and to prepare working shop drawings calling for the use of mill-polished plates.

er, and had conducted a welders' trade school, teaching both the sigma and the heliarc welding processes. He had never undertaken a welding contract, but was interested in obtaining such contracts and had discussed the matter with representatives of Green.

A welder named Karl had answered one of Green's advertisements for a welding foreman, and during the summer of 1956 Gordon negotiated first with Karl and then with Karl and Knief with the intention of having one or both of them undertake the welding, erection and testing of the cloud chambers. He also discussed with them the polishing of the welds, but neither Karl nor Knief had had any experience in this type of work. Little, if anything, was said at that time about the "final polishing" called for by section 8–06j of the specifications, probably because no one thought this would be an important item. Knief knew that the tack-welding of the structural steel would necessarily cause burned spots which would have to be polished, however carefully and by whatever method the tack-welding was done, but he assumed they would be removed in the final polish. The negotiations finally resulted in a contract between Green and Arc, dated August 24, 1956, which was later superseded by a contract between the same parties, dated November 1, 1956. It was originally contemplated that the August contract be with Karl and Knief as associates, but for reasons not important in this case Knief undertook the contract alone, and organized the plaintiff corporation (Arc) in October 1956.

The August contract called for the following work to be done by Arc: "Complete erection, Fabrication and Testing of two (2) Stainless Steel Cloud Chambers in accordance with drawings (as per rider attached)." The rider listed the drawings and, under the heading "Work", contained three paragraphs, two of which were identical with those quoted below from the rider to the November contract. The third paragraph read as follows: "Polishing of the welds is not a portion of this subcontract". The consideration stated in the August contract was $33,000. The calculation of that consideration did not include any amount for final polishing or any other polishing. At the time the August contract was executed Gordon had reached no decision as to who should do any of the polishing required by Green's subcontract with Blount, except the polishing at the mill to create the original No. 4 finish. The August contract between Green and Arc did not require Arc to do any polishing.

Between August and November, Knief and representatives of Green visited various plants to see how those plants polished welds. Finally, about November 1, Knief agreed, on behalf of Arc, to undertake the work of polishing the welds for $16,000 in addition to the $33,000 consideration provided for in the August contract. A sub-sub-contract dated November 1, 1956, between Green and Arc was prepared by Gordon and executed shortly after November 1. By that contract, for a consideration of $49,500,[3] Arc agreed to:

"* * * furnish all labor and materials and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of the Contractor, and all work incidental thereto, namely:

"Complete erection, fabrication, testing and polishing of two stainless steel cloud chambers in accordance with drawings (as per rider attached)."

The printed portion of the contract contained the following Article: "The provisions of the attached rider comple-

3. No one could explain satisfactorily why the consideration was $49,500 rather than $49,000. Gordon knew that the additional consideration for the November contract was intended to cover only the polishing of the welds.

ment and are a part of the printed contract". The rider listed some 38 drawings and sketches by number and then, under the heading "Work", contained the following three paragraphs:

"All rigging work, erection and welding necessary. Testing work necessary to make a complete and satisfactory job in accordance with the aforementioned drawings, plans and specifications.

"It is understood and part of this subcontract that the structural steel backing for the stainless steel plates will be delivered prefabricated and polished in accordance with the aforementioned drawings.

"Polishing of the welds is a part of this contract. All interior surfaces welded to be polished to a No. 4 finish with a maximum roughness finish tolerance allowable of 42 micro inches."

Arc agreed to start work as soon as instructed by Green and to carry on the work promptly, efficiently and at a speed that would not delay Green or its other subcontractors. Any damages for delay by Arc were to be deducted from the price as liquidated damages. Arc agreed to perform all extra work ordered by Blount, or the Corps of Engineers, but Green was not to be held liable to Arc for any extra labor, materials or equipment unless Arc had a written work order from Green.

Gordon told Knief, on or about November 2, before the November 1 contract was signed, that he was inserting in the rider the phrase "with a maximum roughness finish allowable of 42 micro inches" to protect Arc, since it was expected that the welds would be polished to the same finish as the rest of the plates, and he (Gordon) had learned—if he did not already know—that a No. 4 finish means in effect a finish not exceeding 42 micro-inches, without pits visible to the naked eye, and he had been told that the Ryerson plates had a finish measuring 42 micro-inches or better.

At the time the August and November contracts were negotiated neither Arc nor Green knew that it would be necessary to remove or fill any considerable number of pits, cracks or crevices. Knief did not intend Arc to assume, nor understand that Arc was assuming by the November 1 contract, any obligation that Arc had not assumed under the August 24 contract except the polishing of the welds. If Gordon intended that Arc assume responsibility for any other polishing, he concealed that fact from Knief.

Upon consideration of all the evidence, and weighing the credibility of the several witnesses, I find that the subcontract between Arc and Green was not intended to require Arc to do the final polishing or any other polishing necessary to create a No. 4 finish, without pits, cracks and crevices on the plates furnished by Ryerson.

*(6) November 1956 to February 1957—Delivery of Plates, Letters and Discussions in re Finish.*

On November 1, 1956, representatives of the Chemical Corps (Using Agency) and of Green met at Ryerson's plant in Philadelphia to make an unofficial examination of the polished plates which were there awaiting shipment to the job site. Measurements made at the plant of areas approximately 3 feet square on two plates indicated a surface smoothness of 42 micro-inches or better. However, six pieces cut from strips sheared from the plates were taken away by representatives of the Using Agency and subsequently measured; these strips showed a surface smoothness ranging from 24 to 63 micro-inches.

On November 7 representatives of Blount, Green, the Corps of Engineers and the Using Agency met at Fort Detrick. The Using Agency indicated that it had originally expected the surface of the cloud chambers to be smoother than indicated by the measurement of some of the pieces of sheared strips obtained at the Ryerson plant on November 1. Gordon, on behalf of Green, insisted that there was no micro-inch standard appli-

cable to a No. 4 finish, and that if Green were required to polish to a definite micro-inch measurement, the additional polishing would be claimed as an extra. The Using Agency finally told the Corps of Engineers that it did not consider a finish of 42 micro-inches to be a No. 4 finish, but that a maximum of 42 micro-inches would meet its needs. The Corps of Engineers decided to make no change in the contract requirements, and no change was ever made.

On November 13 Green told Blount that the Ryerson steel was "equal or superior to a stock No. 4 finish of the U. S. Steel Corporation" for stainless steel plate. Gordon also told Blount that a guaranteed 42 micro-inch finish on plates and welds could be given for $54,000. This offer was orally reported by Blount to the Corps of Engineers. The Corps told Blount that the offer was not acceptable and that the price was entirely too high. Blount reported this to Green.

On November 19 Green forwarded to Blount a letter from Ryerson stating: "The plates have been polished to a standard No. 4 finish * * * by comparison of finish standards as used by Allegheny-Ludlum Steel Corporation, who produced these plates, and standards observed by other mills such as U. S. Steel Corporation, we represent these plates to be fully equivalent, or perhaps superior to the competitive plates indicated". Blount communicated the substance of this letter to the Corps of Engineers, and on November 23 the Corps told Blount that if the finish on the plates was equal to U. S. Steel Corporation's stock No. 4 finish, fabrication of the cloud chambers should proceed. Blount reported this conversation to Green by telephone and confirmed it by letter.

On November 23 the plates, covered with adhesive paper and boxed in crates, were delivered to the job site. They were unloaded by Arc, using labor and a crane supplied by Blount and paid for by Arc, and were placed on a platform which had been built by Blount for Arc. The plates were not uncrated at the time and the Corps did not inspect them before it told Blount on November 23 that fabri-

cation of the cloud chambers with the Ryerson plates should proceed if the finish thereon was equal to U. S. Steel Corporation's stock No. 4 finish.

The surface of the stainless steel plates delivered by Ryerson varied in smoothness from under 42 micro-inches to over 75, nearly 100 micro-inches. Most of the plates also had many deep pits, which would have been visible to the naked eye if they had not been covered with paper. They could not properly be said to have a merchantable No. 4 finish.

On November 26, Green wrote Blount a letter which recognized that the Corps of Engineers had concluded not to require any specific micro-inch requirement for the finish, but insisted that further efforts be made to obtain from the Corps a specific finish standard for the welds.

On December 10 Blount sent the Corps six notarized copies of Ryerson's November 15 certification and asked the Corps to inspect the plates at the job site and accept them as meeting the "specifications and the amplifying letter written by Col. Chapman on May 14, 1956". Blount also asked for an agreement on "what constitutes an acceptable No. 4 finish on welds", and suggested that "we determine the roughness range, in micro-inches, on the plates at the job site at this time and use that as a basis for determining whether a weld is acceptable or not". In response to this letter a meeting was held at Fort Detrick on January 2, 1957, at which the Corps of Engineers requested the Using Agency to furnish a sample of a finish acceptable to it, and Blount requested, in turn, that it be given such a sample.

On February 4 the Corps of Engineers sent Blount a letter together with a small piece cut from one of the pieces of sheared strip that the Using Agency had brought back from the Ryerson plant on November 1, 1956. The letter from the Corps to Blount stated: "The sample is furnished only as a guide of the desirable finish to be obtained in the Cloud Chambers". The sample had a surface smoothness of 35 to 41 micro-inches as measured by a Brush surface indicator, and had been selected because it was free

of all pits. Blount made a visual comparison of this sample with some of the plates at the job site and obtained a micro-inch measurement of the sample, by use of a profilometer, which showed an average roughness of 45 micro-inches.[4] Thereafter Blount retained the sample, but showed it to Clare, Green's Assistant Project Engineer, who was then Green's representative at the job site, and it was available to Green at any time if Green had asked to see it again.

On February 20 Green wrote to Blount requesting a further specification of the finish and again indicating that if 42 micro-inches were specified an increase in price would be involved. On the same day Blount advised the Corps of Engineers, by letter, that the surface of the plates at the job site appeared on a visual inspection to be equal to or better than the sample which the Corps had sent as a guide, inquired whether the Corps desired to specify a definite micro-inch requirement, and pointed out that if they did an increase in price would be involved.

On February 27 the Corps of Engineers replied, by letter, stating:

"As mentioned in your letter, the specifications do not refer to a micro inch measurement. Insofar as known to the writer, there is no relation between a No. 4 finish and a micro inch measurement. The provision of a No. 4 finish as specified in the contract documents is the responsibility of the contractor.

"Since you have been able to obtain a certificate from the Ryerson Steel Company stating that the finish on the stainless steel sheets is No. 4, I see no reason for delaying the construction of the Cloud Chambers.

"There is no desire at this time on the part of the Corps of Engineers

or the Using Agency to modify the contract to include the measurement of the stainless steel finish in terms of micro inches."

A copy of this letter was shown to Green's representative on the job site who had written Green's letter of February 20, 1957.

On February 28 Blount replied to Green's letter of February 20, and advised Green that "the Corps of Engineers and the Using Agency do not wish to modify the contract to include any additional finish on the cloud chamber plates", and therefore, "since we have notarized statements supporting our claim to a No. 4 finish, we have given the Corps of Engineers the material required under the contract specifications and I feel there is no further point in pursuing this item any further."

*(7) December 1956 to February 1957—Sigma Process Welding, Spacing, Warpage and Buckling.*

The general contract specifications required that the heliarc process be used for welding the plates together to make the walls and baffles. Before the welding was begun, Green suggested that the sigma process be used rather than the heliarc process; Arc concurred in the suggestion, and permission to use the sigma process was obtained from the Corps of Engineers.

On December 26, 1956, Arc began welding the plates and fabricated the north wall of B Chamber, at a cost of approximately $2,800, using no copper backing bar to disseminate the heat of the welding, because its use was then forbidden by the Architect, who feared copper contamination of the welds. Knief did not think that it was necessary. At first Arc spaced the plates for this wall $\frac{1}{8}''$ apart, which is the proper technique for welding plates $\frac{3}{16}''$ thick, but, on instructions from Green and Vitro[5]

4. Some measurements referred to in the evidence were made with a profilometer and some with a Brush surface-finder or analyzer. These devices ordinarily do not give exactly the same reading, the profi-

lometer ordinarily running higher, but the differences are not material for the purposes of this case.

5. Vitro was a firm of architects and engineers employed by the Corps of En-

reduced the space between the plates to ¾₄″, as required by Green's shop drawings. Arc warned Green and Vitro that this would cause buckling and warpage of the wall, but proceeded as instructed to use a ¾₄″ spacing and the sigma welding process. As a result of the narrow spacing and the heat generated by the welding, the plates of this wall expanded and buckled so badly that it was necessary to saw the wall apart and reweld. Acting upon the recommendation of a welding expert from Allegheny-Ludlum, Green requested and received permission to return to the use of the heliarc welding process and to use a copper backing bar on the back of the welds. Green also permitted Arc to widen the spacing between plates to ⅛″. No warpage and buckling was encountered thereafter. The warpage and buckling of the north wall of B Chamber was not caused by negligent welding or any other negligence on the part of Arc.

During January and February, 1957, Arc sawed open the welds or seams of the north wall of B Chamber and reconstructed it at a cost of $1,891.05.

### (8) Polishing the Welds.

After the buckling and warpage had been corrected, Arc proceeded to polish the welds. This was done by grinding the welds with coarse abrasives, and then polishing them with a 120 grit belt. The use of the 120 grit belt produced a surface smoothness on the welds of 33 to 38 micro-inches. On January 5, 1957, the Using Agency checked the surface of the polished welds with a Brush surface analyzer and found that the final use of 120 grit would produce a finish below 42 micro-inches.

### (9) Paper Removal.

Gordon told Knief that the steel plates would be covered by a standard type of adhesive paper. Removal of the protective paper covering on the plates would ordinarily have been incidental work nec-

gineers to design the cloud chambers and to render other architectural and engineering advice to the Corps of Engi-

essary before the testing called for by all the contracts could be done.

Although strippable protective paper was available, Ryerson or Allegheny-Ludlum had covered the mill-polished surfaces of the stainless steel plates with a heavy manila paper, using as an adhesive a rubberized or latex glue, which was impervious to water and to most solvent materials and was very hard to remove. This difficulty became progressively worse during the construction of the cloud chambers, especially as the weather grew warmer in the spring. Except for a few places where a square foot or so could be pulled off in one operation, the removal of the paper and the adhesive required hand scraping with plastic or soft wood scrapers for about half of the area, and for the other half grinding it off with coarse 36 grit abrasive.

### (10) January 1957 to April 1957 and Beyond—Grinding and Polishing the Plates, Including Burned Spots from Tack-welding.

After Arc had completed its first fabrication of the north wall of B Chamber, Arc turned the wall over on January 5, 1957, and observed, in addition to the warpage and buckling, that each tack-weld along the structural steel channel flanges, applied as prescribed by Green's shop drawings, had caused a "burned spot" on the surface of the plate (i. e. a discoloration and destruction of the mill-finish) about 1″ x 1½″ in size. Similar spots were caused later by welding the V-bars and stiffeners to the baffles. Similar spots were also caused by welding to the back of the plates the "dogs" which held the copper backing bar, suggested by Allegheny-Ludlum and approved by Arc, Green, Blount and the Corps of Engineers. These spots were not caused by the presence of the paper nor by any negligence on the part of Arc. No engineer connected with the Corps of Engineers, Blount or Green, ever objected to Arc's method of tack-welding.

neers. However, all of the contracts named the Corps of Engineers as the Architect and Engineer.

It was necessary to remove the spots to restore the finish on the plates. Arc voluntarily polished a few of the spots to see what was involved, but did not undertake to polish all of the spots until Green, per Gordon and Clare, had promised to pay him for doing so. At the direction of Green and Blount, Arc undertook to remove these spots by polishing with 120 grit abrasive. Such spot polishing was found to produce scratches on the finish of the plates in the areas surrounding the burned spots.

By this time it had become apparent that the plates as delivered by Ryerson did not have a No. 4 finish and had thousands of deep pits and tens of thousands of smaller pits scattered over their surfaces.[6] Blount insisted that Green was bound to comply with the specifications and to perform any polishing necessary to bring the surface of the plates to a No. 4 finish without pits, cracks, and crevices, and that Arc as Green's subcontractor should do the necessary polishing. Arc declined to do this overall polishing unless Green would agree to pay for all polishing (except the polishing of the welds) as extra work over and above Arc's contract with Green. After some discussion Gordon orally agreed that Green would pay for this polishing as extra work, and repeatedly insisted that Arc proceed with the work and send Green the bills, which Green forwarded to Blount as part of Green's claim against Blount. Arc knew that Green was doing this. From time to time Gordon would tell Arc not to do any extra work without a formal order, which he never supplied, all the while insisting that Arc get on with the work as speedily as possible.

On March 13, 1957, Arc began to polish the entire surface of the plates of two walls of A Chamber. There were numerous pits, scratches and dents in the surface of the plates. Some of these scratches and dents resulted from the paper removal and a few resulted from other damage inflicted on the plates while at the job site. A very large number of pits—some 6,700 large pits and many times that number of small pits—had been in the plates when they were shipped by Ryerson. Arc first filled the deep pits with welding metal, ground the larger pits with coarse abrasives (36 to 100 grit), and then polished the entire surface of the plates with a 120 grit belt. After completion of this process, the plates frequently still had pits and scratches which were visible to the naked eye. Some of these pits had been uncovered in the grinding and polishing process. Any such pits and scratches remaining on the surface were then removed by further filling, grinding and polishing. This work usually resulted in a surface smoothness of about 33–38 micro-inches, but Arc did no more polishing than was necessary to achieve a No. 4 finish.

All of this polishing was done by Arc by the use of hand tools or machine tools without the use of a lubricant. Although lubricants are used for polishing in the mills, and Arc's failure to use a lubricant may have developed some pits, it also saved time. I find that the total cost of grinding and polishing was not increased by the failure of Arc to use a lubricant, and that Arc did the grinding and polishing in a workmanlike manner, using reasonable skill and care under all the circumstances.

On April 3, a meeting was held at Fort Detrick at which representatives of the Corps of Engineers and the Using Agency, at the request of Blount and Green, inspected those two walls to determine whether the surface finish then on those walls was acceptable. Representatives of Arc, Green and Blount were present at this inspection. The Corps of Engineers stated that the surface was acceptable provided the pits and scratches visible to the naked eye were removed by a final polish. In order to accomplish this, Arc was required to do some additional grinding and to repolish the entire surface with 120 grit.

The requirement of the Contracting Officer that pits and scratches visible to

---

6. See letter from Green to Ryerson dated June 7, 1957, in Ultimate Finding (11), infra.

the naked eye be removed was a reasonable interpretation of the specifications calling for "a No. 4 finish without pits, cracks, or crevices".

*(11) Letters and Claims after April 3, 1957.*

After the meeting on April 3, 1957, Green continued to demand further specification of the finish and polish requirements and represented to Blount and the Corps of Engineers that Arc was unable to proceed with the polishing because of uncertainty as to those requirements. At Gordon's insistence and because Green was withholding money due Arc, Knief wrote a letter making that representation to Green. Green's demands were made for the purpose of obtaining a direction from the Government or Blount requiring a specific micro-inch finish, with the intention of making a claim for extra work if such a direction could be obtained. In fact, Green knew what polishing was required in order to produce a finish which the Government would accept. No delay was caused in the performance of the contract by any uncertainty on the part of either Arc or Green on this point.

On June 7, 1957, Green wrote Ryerson as follows:

"Upon removal of the protective paper from the polished surface we find pits or crevices in the metal of these plates. In completing our contract, it is required that all cracks and crevices be removed in the final polish. Some of these holes are very small and some are as large as the head of a pin and as deep as ⅟₃₂″. In order to remove these pits, our contractor has had to weld them shut and grind and repolish the surface. This has caused considerable extra work for our contractor, Arc & Gas Welder Associates, Baltimore. Their contract with us calls for grinding and polishing of the weld area. These pits occur most anywhere in the plates.

" * * * These pits have occurred in most every plate that has been used so far."

Meanwhile, in May 1957, Arc had requested Green to make progress payments then due Arc and to make payment for the extra work done by Arc in polishing the surface of the plates. When Green refused to make such payments, Arc demanded arbitration. Upon Green's continued failure to pay or to agree to arbitration, Arc threatened to stop work on Friday, June 14. Knief told Blount that Arc was stopping work primarily because of Green's failure to make adequate payments on account, but that Arc felt that the polish requirements of the specifications should be further clarified. Blount agreed to press Green to bring its payments up to date and to seek further clarification of the finish requirements from the Corps of Engineers, upon the representation of Knief that Green was uncertain as to what those requirements were.

On June 24 and June 28, 1957, the Corps of Engineers wrote Blount, referring to previous letters and conferences, and saying (June 24): " * * * it is difficult to see how the specification can be further clarified", and (June 28):

"The intent of Section 8–06f (3) & j, to which you referred in our conversation of this date is to obtain Cloud Chambers having a No. 4 finnish unblemished by scratches, pits, or crevices * * *. Assuming the plates to have been free of imperfections on shipment, the object of the final polish is therefore to restore the plates to the original No. 4 finish as produced by the mill.

"Approval to proceed with construction of the cloud chambers * * was based on a notarized statement from the Ryerson Steel Company certifying the stainless steel plates to be a No. 4 finish as produced by that company. Surface imperfections that may have remained after this mill finishing, and accumulated imperfections resulting from packaging, shipping, fabrication and erection are to be removed by a final polishing."

Copies of these letters were forwarded by Blount to Green. Green thereupon wrote to Blount:

"This letter is to put you and the Government on notice that each day since April 1, 1957 additional polishing over and above the contract specifications is being done during the fabrication and erection of the Cloud Chambers by our subcontractor, Arc & Gas Welder Associates.

"Our basis for doing this extra polishing is in compliance with Major Murray's letter of June 28, 1957", from which Green quoted the portions set out above.

On August 13, 1957, Arc filed a claim with Green for extra work claimed by Arc to have been done by it in polishing and grinding the plates from the beginning of the job to July 31. This claim included all grinding and polishing that Arc claimed to have done during the period up to July 31 except the grinding and polishing of the welds.[7] Thereafter, five monthly statements were rendered by Arc to Green claiming payment for all of Arc's grinding and polishing of the welds. These bills purported to show the man hours spent on extra work over and above Arc's contract, specifying the nature of the work and the particular wall involved. They listed the total man hours for each class of labor, multiplied by the hourly rate, resulting in a total labor cost. To this was added 7½¢ per hour for "health and welfare fund", $1,000 a month for Knief's time as superintendent, 40% of the "travel time" paid by Arc to its laborers, 15% for overhead on all items except Knief's salary, 5% profit, and 40% of usable material costs.

These statements were forwarded by Green to Blount with letters in which Green contended that they were for extra work not covered by the contract

between Green and Blount. Green added 15% for Green's overhead and 10% for Green's profit to each of Arc's claims.

Blount forwarded these claims to the Contracting Officer. A typical forwarding letter said: "Inasmuch as we are the General Contractor, we assume that the enclosed revised proposal is submitted in our name and we would, of course, expect to add our usual percentage to this amount as it is computed in its entirety."

Neither Green nor Blount ever questioned the amount of these bills, any item contained therein, or the manner in which they were calculated until the summer of 1959, more than a year after the bills were rendered, except that on July 3, 1958, when Green tendered Arc's total claim, it stated: "We neither endorse nor deny this claim nor do we make any commitment as to its validity; but enclose without comment". Blount replied on July 31, 1958, as follows: "As you know, this claim was presented to us through your Company and was appealed to the Corps of Engineers' Claims and Appeals Board at your request. You also added to such claim certain costs of your own and an allowance to you for overhead and profit. In your earlier letters, you have always unequivocally insisted that the Arc & Gas Welders' claim is meritorious. You have never before indicated that you did not endorse and support such claim." During the trial of the case, however, Arc modified its claim several times, reducing the number of hours shown on the various monthly statements.

On January 10, 1958, the Contracting Officer forwarded to Blount a formal written decision finally rejecting Green's claims for extra work.[8] Green requested Blount to appeal this decision to the Chief of Engineers, as permitted by the provisions of the general contract; such

---

7. On April 1, 1957, Gordon had asserted against Blount a claim for extra work up to March 31, 1957, in the amount of $34,689.87, which included Arc's additional polishing up to that time, as estimated by Arc.

8. The "Plate Claim", see II. (A) (2), infra, and the "Polishing Claim", see II. (A) (3), infra.

an appeal was taken and is presently pending. Thereafter, Green requested that its counsel be given full authority to conduct and prosecute the appeal proceedings, to which Blount agreed, on conditions designed to keep Blount informed.

*(12) Work Orders and Waiver.*

No formal request for a contract modification or extra work order for polishing was ever made by Knief.

However, the extra plate polishing work performed by Arc was ordered by Green orally, and Green promised to pay Arc therefor before Arc did the work. Numerous writings sent by Green to Arc —letters, progress reports with schedule of future work, and copies of letters passing between Blount and Green—confirmed those oral orders.

Moreover, from time to time Green ordered Arc to perform 17 separate items of extra work (in addition to the disputed items sued for in this case) for which Green paid Arc a total of $12,137.-53. For five of the 17 items and part of a sixth, formal written work orders were given Arc by Green before the work was done. One item was ordered by letter and a formal work order given after the work had been done. Two items were ordered orally and formal work orders given after the work had been done. Eight items and part of a ninth were done by Arc on oral orders from Green, with no written orders, formal or otherwise, at any time, and Green paid Arc $8,282 for those items. The work on these nine items was done by Arc at various times between January 10, 1957, and December 31, 1957; bills for these items were sent by Arc to Green on various dates between May 17, 1957, and January 20, 1958, and were paid by Green to Arc on various dates between July 29, 1957, and February 20, 1958. All of the items represented extra work made necessary by the fault of Ryerson or Richmond Engineering Co., suppliers or sub-subcontractors of Green, who gave Green credit or reimbursed Green for the amounts Green paid to Arc for these items.

*Findings of Facts and Conclusions of Law on the Several Claims.*

**I. (A) Arc's Claims against Green.**

(1) For the retained percentage.

It is conceded that Arc has a valid claim against Green for this item in the amount of $5,364.85.

(2) For additional work.

(a) Minor items. It is conceded that Arc has a valid claim against Green for repairing defective quarter rounds ($864), and for grinding V-bars ($1,696.-80), a total of $2,560.80.

(b) Grinding and polishing the plates, including paper removal.

The first question to be decided is whether the November 1, 1956, contract between Green and Arc was ambiguous with respect to the extent and kind of polishing Arc was required to do. Everyone concedes that the contract required Arc to polish the welds. Arc contends that the contract did not require it to do any other polishing. Green contends that the contract required Arc to do the final polishing and all other polishing called for by Green's subcontract with Blount.

The polishing which is in dispute includes:

(Class A)—Grinding and polishing made necessary by the defective condition of the plates furnished by Green,

(i) because the number and depth of the pits and other defects in the plates when delivered by Ryerson prevented them from having a merchantable No. 4 finish;

(ii) because the plates were covered with an unusual kind of adhesive paper, the removal of which necessarily resulted in many scratches and developed additional pits.

The contract clearly did not require Arc to do the grinding and polishing necessary to correct these Class A conditions, which were the fault and responsibility of Ryerson and Green. See particularly Green's letter to Ryerson, June 7, 1957, quoted in Underlying Facts (11), supra.

(Class B)—Polishing made necessary by

(i) Arc's own work, principally the burned spots caused by the tack-welding and welding of the dogs;

(ii) Damage to the plates while stored at the site or in place, caused by Green, by other subcontractors, or by Blount.

Of course, if the burned spots or other conditions requiring polishing had been caused by negligence on the part of Arc, Arc would have been obligated to correct the conditions or pay for their correction. Since Arc was not negligent in its tack-welding or other welding, or in its care of the plates, this point does not require any further discussion. We are concerned only with burned spots, scratches and other conditions not caused by negligence on the part of Arc, but resulting from the nature of Arc's work or from the acts of others.

The November contract admittedly did not require Arc to do all of the polishing required by the specifications; Green concedes that under its contract with Ryerson and Ryerson's order from Allegheny-Ludlum, the mill was supposed to do the initial polishing to bring the plates to a No. 4 finish. The word "polishing" in the body of the November contract did not mean all polishing, and we must look elsewhere—to the rider— to see what polishing was meant. The rider refers only to the polishing of the welds, and there is no mention in the November contract or rider of "final polishing".

The contract does not clearly and unambiguously require Arc to do the final polishing, or any polishing except the polishing of the welds. Taken most favorably to Green, it is ambiguous on this point. It will make no difference in the result whether or not the contract be construed as clearly *not* requiring Arc to do any polishing except the polishing of the welds, because after considering all the facts and circumstances, I have found that Arc did not undertake by either the August or the November contract to do any polishing except the polishing of the welds. See Underlying Facts (5), supra.

When the burned spots caused by the tack-welding developed, Green ordered Arc to remove those spots by polishing and promised to pay Arc for that work. It shortly became apparent that such spot polishing would be futile, principally because (1) the rough finish of most of the plates as delivered by Ryerson, and (2) the removal of the paper and the latex adhesive, made an overall polish necessary to create a No. 4 finish, without pits visible to the naked eye, let alone a "No. 4 finish without pits, cracks and crevices". See Underlying Facts (10). Green ordered Arc to do this overall polish under directives which, in the light of all the circumstances, waived the requirement of a formal extra work order and obligated Green to pay Arc for any and all of the polishing not already required of Arc by the November 1 subsubcontract.

Green contends that Arc's claim for this extra work is barred because Arc did not obtain a written work order from Green therefor, as called for by the contract between Green and Arc. Green relies on Abbott v. Gatch, 13 Md. 314, 331, where the court said that if "one party omits to have the changes reduced to writing, they must, in view of the rights of the other, be deemed to have been made with reference to the contract price, unless there be proof of an express waiver of that clause of the contract, or a promise to pay for the extra work". In the instant case I have found, Underlying Facts (10) and (12), that Green promised to pay for the extra work. The most recent Maryland case not only reaffirmed the obligation to pay when there has been both an oral order and a promise to pay, but held that such a provision can be waived by implication or by course of dealing, as well as by an express waiver. Freeman v. Stanbern Construction Co., 205 Md. 71, 79, 106 A. 2d 50. See also Ross Engineering Co. v. Pace, 4 Cir., 153 F.2d 35, 49; Benson v. Borden, 174 Md. 202, 219, 198 A. 419; Wright v. Wagner, 182 Md. 483, 490, 34 A.2d 441. The payments made by Green to Arc for extra work done by Arc on

Green's oral orders, set out in Underlying Facts (12), were made after Arc began the extra polishing work, and so do not constitute a course of conduct which would allow Arc to claim that Green is estopped to set up this defense; but the payments are evidence to be considered with all of the other facts in deciding whether Green waived by implication the written order requirement with respect to the extra polishing.

If we were dealing with the polishing of the burned spots on the plates and baffles as an isolated item, it would be a close question whether such polishing was required of Arc by its November contract with Green. Even so treated, I would find, upon a consideration of all of the evidence, that it was not covered by the November contract. Under the facts of this case, however, not only would the polishing of the burned spots on the plates and baffles (once over with a 120 grit) have been a comparatively minor item, the polishing of the burned spots alone would have been futile. The defective finish on the plates as delivered and the removal of the adhesive paper made it necessary to grind and polish the entire surface of almost all the plates, using various coarse grits, filling some pits with weld metal, finishing with 120 grit, and going over a large number of the plates a second time. This grinding and polishing was not the responsibility of Arc under its subcontract, but was caused by the failure of Green and Ryerson to supply plates with a merchantable No. 4 finish, covered with a proper adhesive.

Under these circumstances, it would not be fair to deduct from the amount Arc is entitled to recover for grinding and polishing any amount to cover what the polishing of the burned spots would have cost. This conclusion is fortified by my decision that Arc's claim for extra polishing should be limited to Arc's actual costs, plus a modest allowance for overhead and profit, rather than the larger amounts claimed by Arc (a) on the theory of account stated or executory accord, or (b) as the reasonable value of such work, based upon various estimates.

■ Arc contends that the bills which it sent to Green from August 1957 to January 1958, see Underlying Facts (11), represent an account stated or an executory accord within the rules stated in Corbin on Contracts, sec. 1303 et seq., esp. 1312. See also Williston on Contracts, rev. ed., sec. 1862, et seq.; A.L.I. Restatement of Contracts, sec. 417, 419, 422. The facts, however, do not support this contention. It is true that Green passed the bills on to Blount as part of Green's polishing claim, adding 15% for Green's overhead and 10% for Green's profit, and that Green did not object to the amount of Arc's claim nor to the items included therein. Blount, in turn, passed the claims on to the Government. But, although Green had originally ordered the work and promised to pay Arc for it, at the time the bills were submitted Green was disputing its liability to Arc for the extra polishing. Arc knew this and knew that Green was taking the position that it was passing the bills on to Blount and the Government as part of Green's claim for extra work, based on the alleged uncertainty of the specifications, which Gordon had persuaded Knief to support. Some of Gordon's methods were not commendable, but under all the circumstances it would not be fair to say that Green's failure to object to the individual items in the bills resulted in an account stated or an executory accord. Chinn v. Lewin, 57 App.D.C. 16, 16 F.2d 512, 49 A.L.R. 1480; and authorities cited above, especially Corbin, sec. 1312, p. 203; Williston, sec. 1862, p. 5228. Moreover, Arc now admits that the hours shown on the bills were inaccurate.

The court should consider, however, that Green and Blount never suggested to Arc that the method of calculating the bills was wrong, that the hourly rates were wrong, or that the charge of $1,000 a month for Knief's supervision was not justified.

Arc polished about 13,437 sq. ft. of plate surface outside the weld areas, an average of one and one-half times, using

three passes with different grits. It is difficult to separate the time required for removing paper and adhesive from the time spent in grinding and polishing the surface of the plates, but the paper removal probably consumed about one-third of the time Arc spent on this additional work. Arc's records showing the time spent on this work are not satisfactory, and its adjusted estimate of 9,478 hours is not accurate. I find that Arc spent about 7,714 labor hours doing such polishing and paper removal. Foreman's time, travel time, indirect labor, materials and other expenses should be apportioned 35% for this extra work and 65% for work covered by the contract and other extra work separately billed.[9] Using the labor rates actually paid by Arc, its costs for the foregoing items total $46,255.69. This figure does not include any charge for Knief's time. Arc had no other business except this particular contract. Knief, who was the sole stockholder of Arc, had expected to continue his other business activities in Baltimore, to have a competent welding foreman on the Fort Detrick job, and to devote relatively little of his own time to the work. However, because of the polishing problems, Knief was required to devote more than a year, essentially full time, to the job. Arc is entitled to include in its costs reasonable compensation for Knief's time, although Arc has not been able to pay Knief because Green has not paid Arc for the extra polishing work. Knief's time was reasonably worth $15,000 a year, but he would have had to devote a small amount of time to the work covered by the November contract. All factors considered, it is reasonable to allow Arc $1,000 a month for twelve months, a total of $12,000, for Knief's time spent in supervision of the extra polishing work, and to allow for overhead and profit 10% of Arc's other costs for that extra work, i. e. 10% of $46,255.69, or $4,625.-57. If, as defendants contend, a somewhat smaller allowance should be made for Knief's time, a larger amount should be allowed for overhead, so the result would be essentially the same. Adding these two items to the $46,255.69 gives a total of $62,881.26, which should be allowed Arc for the extra polishing and paper removal.

This is considerably less than the amount which the witness Sam Tour testified would be the reasonable cost of doing the work. He testified that in his opinion the time required to do the job would reasonably run 8,437 hours and that a reasonable hourly charge, including 15% for overhead and 5% for profit, which he also said was reasonable, would be $8.93, a total cost of $75,342.41. Plaintiff contends that it should be allowed at least this amount as representing the value of the work to defendants, citing, inter alia, A.L.I. Restatement of Contracts, sec. 347; Williston on Contracts, rev. ed., sec. 1479 et seq.; Corbin on Contracts, sec. 1112; Rodemer v. Gonder (Henry Hazlehurst & Co.), 9 Gill, Md., 288. Although I accept the testimony of the witness Tour, his estimate was necessarily based on certain assumptions he was asked to make. There are a number of factors in this case which persuade me that Arc's actual expenses, including its claimed allowance of $1,000 per month for Knief's time, plus a reasonable allowance for overhead and profit, is the fair measure in this case. For one thing, Arc had little overhead; Knief was the whole organization. For another, the cost of the work is always to be considered in measuring reasonable value, although it is not the sole measure. Williston on Contracts, sec. 1483.

### Interest

█ The construction of the cloud chambers was substantially completed on January 4, 1958. Almost all of Arc's work was done in 1957. There was no excuse whatever for Green's withholding progress payments from Arc or for Green's failure to pay Arc a reasonable

---

9. The "other expenses" so apportioned total $9,314.14. The amounts spent by plaintiffs for attorneys' fees should not be included in the claim in any amount or proportion.

amount on account of Arc's extra work as the work progressed. All facts considered, Arc should be allowed interest at 6% per annum on its total claim from January 4, 1958. Robert C. Herd & Co. v. Krawill Machinery Corp., 4 Cir., 256 F.2d 946, 952.

Arc is therefore entitled to recover from Green

| | | |
|---|---|---|
| (1) Retained Percentage | $ | 5,364.85 |
| (2a) Minor Items | | 2,560.80 |
| (2b) Polishing, etc. | | 62,881.26 |
| | | $70,806.91 |

with interest at 6% per annum from January 4, 1958.

### The Claims Based on Warping— Included in I.(A) (2), II.(C), III.(A).

Before signing the August and November contracts with Green, Knief knew or should have known that the shop drawings prepared by Green called for %64″ spacing between the plates, but he made no protest until after the plates had been delivered and he was about to start the welding. When he did object, Green and Vitro told him to proceed according to the drawings because the plates had been cut with the %64″ spacing in mind. The narrow spacing, possibly aggravated by the change from heliarc to sigma welding, caused bulging and warping of the welded plates which delayed the job three or four weeks and cost $1,891.05 to correct.[10]

■ I.(A)(2)—Arc cannot collect the $1,891.05 from Green or Blount because of Knief's delay in objecting to the spacing, and his failure to object to the change in the welding method.

■ II.(C)—Green cannot charge Arc for the delay, because the original error was in the shop drawings, which were prepared by Green, and Green took no steps to correct the error until after the warping, which caused the delay, had occurred.

■ III.(3)—Blount cannot charge Green for the delay because neither Blount nor the Corps of Engineers objected to the shop drawings when they were submitted for approval, and Vitro, representing the Corps of Engineers, acquiesced in the decision to go ahead with the narrow spacing when Arc first called it to the attention of Green and Vitro, and Blount is responsible for Vitro's action vis-a-vis Green.

### I.(B) The Claims by Arc against Blount and U.S.F. & G.

(1) It is agreed that Blount and its surety are liable to Arc for a net amount of $639.24 for work done by Arc for Blount not covered by Green's subcontract, less a credit for electricity supplied by Blount to Arc.

■ (2) Under the Miller Act, 40 U. S.C.A. 270b, Blount and its surety are liable to Arc for the amount found to be due to Arc by Green, namely $70,806.91, with interest from January 4, 1958.

There is no merit in Arc's claim, supported by Green, that Blount is primarily liable to Arc for anything except the items covered by (1) above. Blount never assumed direct liability to Arc for the other items orally or in writing. Arc sent no bills to Blount therefor and made no demand against Blount (except under the Miller Act) until the filing of this suit. It is conceded that Arc gave Blount the notice required by 40 U.S.C.A. § 270b (a).

### II.(A) The Claims by Green against Blount and the U.S.F. & G.

II.(A) (1) For the Retained Percentage.

Blount holds an unpaid balance of $22,091.82 due Green under the subcontract, subject to any offsets to which Blount may be entitled.

II.(A) (2) The Plate Claim.

■ The facts underlying Green's "plate claim" are set out in Underlying Facts (1), (2), (3) and (4), supra.

---

10. Thereafter, on the advice of Solomon, of Allegheny-Ludlum, the spacing was increased to ⅛″, the heliarc method of welding was again required, and the use of copper backing bars was permitted. See Ultimate Findings (7), supra.

On April 1, 1957, Green filed a claim against Blount for extra work, contending that the facts, particularly the May 14, 1956, letter from the Corps of Engineers to Blount and the May 15, 1956, letter from Blount to Green, modified Green's subcontract, required Green to have the polishing done at the mill rather than in the field, and constituted an order for extra work. Green argues that the Government improperly rejected the "pack roll" sample offered by Green and directed Green to supply a finer finish than was required by the specifications, so that Green was forced to change to a more costly method of fabrication.

Since the sample had many pits, cracks and crevices and was not a No. 4 finish, the Government was clearly justified in rejecting the sample.

Neither the letter of the Corps of Engineers of May 14, 1956, nor Blount's letter of May 15, 1956, altered the requirements of Green's subcontract. See Underlying Facts (4). Neither the Government nor Blount required Green to have the polishing done at the mill rather than in the field.

 The interpretation of the specifications by the Architect (in this case the Corps of Engineers) is binding on the parties and is not reviewable by the courts in the absence of fraud, collusion or bad faith. Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 36 S.Ct. 662, 60 L.Ed. 1058; United States for Benefit and on Behalf of Lanehart v. United Enterprises, 5 Cir., 226 F.2d 359; Hughes v. Model Stoker Co., 124 Md. 283, 92 A. 845. There is no evidence of fraud, collusion or bad faith in this case.

At the request of Green its "plate claim" was submitted by Blount to the Corps of Engineers, and was rejected by formal decision of the Contracting Officer on January 10, 1958. At the request of Green, Blount appealed this decision to the Chief of Engineers; that appeal is presently pending. On the evidence in this case, the "plate claim" is without merit, and Green is not entitled to recover from Blount thereon.

## II.(A) (3) The Polishing Claim.

 The principal part of this claim represents Green's efforts to pass on to Blount (and the Government) Arc's claim against Green for additional grinding and polishing. Green contends that the Government ordered additional field polishing of the fabricated plates in addition to the finish and polish required by the original contract.

The general contract, quoted in Underlying Facts (1), required that all stainless steel surfaces inside the cloud chambers "be polished to a No. 4 finish without pits, cracks and crevices".

Green accepted without demur the subcontract embodying these specifications, and ordered plates with such a finish from Armco. There was no trouble about the matter until Gordon took over, canceled the Armco order, and tried to find some cheaper way of achieving a result which would be accepted by the Government. These efforts failed. Neither Gordon nor anyone else at Green made any protest against the letter of May 14, 1956, from the Corps of Engineers, which Green interpreted as "requesting a No. 4 finish comparable to the 'U. S. Steel Corporation's stock No. 4 finish'." Green included this provision in the order which it placed with Ryerson for the plates. Ryerson did not object and did not make any extra charge because of that addition to its bid. The regular or standard U. S. Steel No. 4 finish is no different from that generally regarded by the industry as a merchantable No. 4 finish; it is obtained by final polishing with 120 grit, and has no pits visible to the naked eye. In practice the roughness of its finish, like that of other merchantable No. 4 finishes, does not exceed 42 micro-inches, although, again like other steel mills, U. S. Steel does not advertise or sell on the basis of a micro-inch standard.

It is true that after examining the plates at Ryerson in November 1956 the Using Agency (Chemical Corps) indicated that it desired a better finish than was shown by some of the samples collected at the Ryerson plant (which ran

as high as 65 micro-inches and had visible pits) and indicated to the Corps of Engineers that it desired a finish better than a standard No. 4 finish. However, after numerous letters and conferences over a period of three or four months, the Corps of Engineers decided not to change the contract specifications, and the Corps of Engineers told Blount that if the surface of the plates had a No. 4 finish, Blount should proceed with the erection.

Gordon had submitted an estimate of $54,000 for guaranteeing a 42 micro-inch finish. The Government refused to accept this proposal and refused to specify a finish in micro-inches, since it was apparent that Gordon intended to use any change in the specifications as the basis of a claim for extra work. In fact, such a change in the specifications would not have required Green to produce a finish any better than it was already required to supply, namely, "a No. 4 finish without pits, cracks or crevices". As we have seen, Underlying Facts (2) and elsewhere, supra, a merchantable No. 4 finish does not exceed 42 micro-inches in roughness. Green recognized this when it prepared the rider to the November contract with Arc, dealing with the polishing of the welds. The requirement in the specifications that the finish be "without pits, cracks and crevices" made the original requirement even more severe.

Green persisted in its efforts to persuade the Government to change the specifications, but the Corps of Engineers steadfastly refused to do so.

When the plates delivered by Ryerson proved not to have a No. 4 finish without pits, cracks and crevices, and to be covered with a type of adhesive paper which had to be scraped or ground off, Green was obligated by its subcontract to produce or restore a No. 4 finish without pits, cracks and crevices. The sub-subcontract between Green and Arc did not pass on to Arc this obligation of Green's. Green, therefore, must bear the cost of Arc's additional polishing work and has no right to pass it on to Blount or to the Government.

*II.(B) Claim by Green against Blount for Wilful Interference With and Malicious Failure to Convey Certain Information to Green.*

Shortly before trial, Green filed an additional counterclaim for $250,000 against Blount, alleging wilful interference by Blount with Green's progress, by orders given to Arc, delay in making progress payments, damage to steel plates at the job site, concealment of information as to the finish and polish required by the Government which was in Blount's possession, arbitrary refusal to supply clear and unambiguous specifications for Green's guidance which were in Blount's possession, and wilful and deliberate refusal to resolve disputes as to work required by the contract, all of which Green claims delayed it in the completion of the contract. The evidence does not support any of these charges.

Green's principal reliance is on the failure of Blount to send Gordon a copy of the letter of February 27, 1957, from the Corps of Engineers to Blount, quoted in Part (6) of the Ultimate Findings, above. However, Blount showed the letter to J. T. Clare, Green's representative at the job site, who had written Green's letter of February 20, which was responsible for the February 27 letter from the Corps, and Blount reiterated the substance of the conversation with Clare in a letter to Green dated February 28. Moreover, Blount showed Clare the sample which had been furnished by the Corps to Blount and it was at all times available to Gordon or any other representative of Green who asked to see it. Green preferred to allow Gordon to develop his unsupported polishing claim. Blount did all it could reasonably be expected to do to obtain clarification of the specifications, as requested by Green, and to pass on Green's claims to the Corps of Engineers.

It is true that Gordon's scheming embarrassed and irritated Blount's repre-

sentatives; they had no confidence in Gordon's ability to coordinate the job or to be fair in his dealings with Arc, Blount and the Government. Blount had so much difficulty with Gordon on another subcontract between Blount and Green that Blount was forced to cancel that subcontract and obtain a new subcontractor to get the work done. Blount was also irritated because in November 1956 Gordon, on behalf of Green, bid for a job on which Blount was also bidding. Most general contractors are displeased when their subcontractors bid against them. The feeling became so bad that in June 1957 Blount went to New York to try to get Green to replace Gordon on the Fort Detrick job and other Maryland work, but was unsuccessful.

Blount had no malice against Green or Gordon, and was guilty of no malicious or wilful acts or failure to act with respect to Green's work. Moreover, Green did not prove that the alleged wilful or malicious acts caused any delay or damage to Green. This claim is entirely without merit.

## II.(C) Claim by Green Against Arc for Delay.

This claim was originally filed against Arc and its surety, but was dismissed with prejudice by Green against Arc's surety during the trial without any payment to Green by the surety. There is no merit whatever in Green's claim against Arc for delay; any and all delays of Arc were caused by defaults on the part of Green or chargeable to Green as between Green and Arc.

## III. Claims by Blount against Green and National.

### III.(A) For Delays Chargeable to Green.

Arc commenced work at the job site on December 10, 1956, and for the first few months made little progress for a number of reasons, including: (1) Lack of adequate supervision and coordination of the work by all parties. (2) Three or four weeks delay caused by the warping and buckling of the plates. See discus-

sion at the end of I.(A)(2), supra. (3) Delay of the Corps of Engineers in deciding whether or not it would modify the specifications. The Corps did not decide to stand on the original specifications until February 1957. This was responsible for most of the early delay, and as between Blount and Green was chargeable to Blount. Thereafter, Green continued its efforts to secure a modification of the specifications, but these unreasonable efforts did not cause any delay because Arc at all times understood what it was supposed to do. (4) The defects in the plates as delivered by Ryerson and the difficulty of removing the adhesive paper. This required grinding and polishing which would not have been necessary if the plates had had a merchantable No. 4 finish when delivered and had been covered with the customary type of adhesive paper.

The Corps of Engineers directed Blount, Blount directed Green, and Green directed Arc to proceed with the erection of the cloud chambers upon the certification by Ryerson that the plates had a No. 4 finish, without making any adequate inspection of the plates which had been delivered, although the Corps of Engineers, Blount and Green all had knowledge of facts which put them on notice that the plates did not have a No. 4 finish free of pits, cracks and crevices.

Blount claims that the grinding and polishing of the plates could and should have been done more quickly. Some delays were caused by the failure of Green to make proper progress payments to Arc. On the other hand, the space in which the work had to be done was narrow and only a limited number of men could work at one time. Blount was in charge of the entire job, responsible for coordination, and for suggesting better means of doing the work. No such better means were suggested by the Corps of Engineers, Vitro or Blount. It is impossible to say with any certainty how much of the delay was caused by defaults on the part of Green. Blount has not met the burden of proving this claim against Green.

### III.(B) For Exoneration and Indemnity Against Arc's Claims.

Under the terms of the subcontract between Blount and Green and the bond furnished by Green and National to Blount,[11] Green and National are obligated to indemnify Blount against any amount which Blount may be required to pay to Arc for work required to be done by Green under the terms of the subcontract between Blount and Green. Arc's claim (aside from the retained percentage) is for extra work, principally grinding and polishing, not included in Arc's November 1 sub-subcontract with Green, but ordered by Green or made necessary by the condition of the plates purchased by Green from Ryerson or both; it is quite clear that the work had to be done by Green or by someone on its behalf in order to complete the work called for by Green's subcontract with Blount, as reasonably interpreted by the Contracting Officer, and that as between Green and Blount, Green is primarily liable for the cost thereof. Green and National are, therefore, obligated (a) to exonerate Blount from any liability of Blount to Arc under the Miller Act for Arc's claims against Green in the amount of $70,806.91, with interest, and (b) to indemnify Blount against any payment Blount is required to make on those claims.

### III.(C) For Counsel Fees.

The subcontract between Blount and Green contained two provisions with respect to counsel fees:

"Article VIII—(a) Sub-contractor shall turn said work over to Contractor in good condition and free and clear of all claims, encumbrances or liens and shall protect and save harmless Contractor and Owner from all claims, encumbrances and liens growing out of the performance of this sub-contract, and Sub-contractor shall at his own cost and expense, (including attorney's fees), defend all suits to establish such claims, and pay any such claims or lien so established."

"Article XIII—* * * (d) Should Sub-contractor default in any of the provisions of this sub-contract and should Contractor employ an attorney to enforce any provision hereof, or to collect damages for breach of the sub-contract, or to recover on the bond mentioned in Article XII, above, Sub-contractor and his surety agree to pay Contractor such reasonable attorney's fees as he may expend therein. As against the obligations herein contained Sub-contractor and his surety waive all rights of exemption."

Throughout this litigation Blount has contended that all of the amounts claimed by Arc against Blount (except the small items resulting in an award to Arc of $639.24 under I.(B) (1) above) are claims growing out of the performance of Green's subcontract with Blount, and are claims for labor, services and materials furnished for use and used in the prosecution of the work covered by the subcontract between Green and Blount. On the other hand, Green has contended that all of the amounts so claimed by Arc are the primary liability of Blount and that Green and National are not liable to protect or indemnify Blount with respect to any of those items. It was, therefore, necessary for Blount to incur attorneys' fees and other costs to defend against Arc's claims and to assert against Green and National whatever rights of exoneration and indemnity Blount may have.

Article VIII(a) above requires Green and National to indemnify Blount against the reasonable counsel fees and expenses incurred by Blount in defending Arc's Miller Act claim against Blount for work which Green was obligated to do under the subcontract between Green and Blount. Article XIII(d) entitles Blount to recover from Green the costs incurred in establishing its right to exoneration

11. See Article VIII—(a) of contract, quoted in III. (C) below, and summary of bond, set out in Underlying Facts (3), above.

and indemnity, and would, if Green were liable to Blount for damages for delay, entitle Blount to a reasonable counsel fee for establishing that claim.

Neither provision of the subcontract entitles Blount to collect from Green any counsel fees expended in defending Blount against Green's claims against Blount.

It was agreed at the hearing that the court should determine the question of Green's liability to Blount for counsel fees before Blount offered any evidence with respect to the amount thereof. I will, therefore, arrange for a hearing to determine the amount which should be awarded Blount against Green and National under the principles set out above.