WEBER ET AL. *v.* CROWN CENTRAL PE-
TROLEUM CORPORATION

[No. 232, October Term, 1956.]

116

*Decided June 25, 1957.*

The cause was argued before Brune, C. J., and Collins, Henderson, Hammond and Prescott, JJ.

*Kenneth C. Proctor*, with whom were *Proctor, Royston & Mueller* on the brief, for appellants.

*Calhoun Bond* and *Mannes F. Greenberg*, with whom were *Cable & McDaniel* on the brief, for appellee.

Henderson, J., delivered the opinion of the Court.

On December 1, 1948, the appellants leased to the appellee, Crown Central, a parcel of ground located at the northeast corner of Loch Raven Boulevard and Yakona Road, in Baltimore County, for the construction and operation by the lessee of a filling station. The dimensions of the lot were 100 feet by 100 feet. The lease was for a term of 10 years, with options to renew for three additional periods of 5 years each, at a monthly rental of $208.34, and an option to purchase at a stated price.

Article XXVI of the lease provided as follows: "In the event of any change in grade of any streets, alleys or highways abutting the demised premises, or the condemnation of the whole or any part of the demised premises which Lessee

shall deem to have rendered the demised premises, or such portion thereof as shall remain after such condemnation, unsuitable for the purpose of a drive-in gasoline filling and service station, Lessee may, at its option, terminate this Lease, in which event all liability on the part of Lessee shall cease upon payment of rent proportionately to the date of such termination; or Lessee may continue in possession of the remaining portion of the demised premises, in which event there shall be a proportionate reduction in rental in the same ratio as the area taken shall bear to the entire area included in this demise."

Under Article II of the lease, appellants were obligated to secure all necessary permits for the filling station prior to June 1, 1949. On May 19, 1949, the parties executed a supplemental agreement extending the time for obtaining permits until August 15, 1949. It appears that the State Roads Commission held up the approval of the permits, because it had a plan for widening Loch Raven Boulevard in front of the property, the details of which had not then been completed. But on June 27, 1949, Crown Central sent the appellants another supplemental agreement, with a letter stating that it was "for an additional 10 feet of land to provide for the future widening of Loch Raven Boulevard as agreed upon and as indicated by the various county and state officials." This agreement was duly signed by the appellants.

This supplemental agreement recited the execution of the lease dated December 1, 1948, and that "circumstances have arisen whereby the Lessee desires to lease more land than was specified under the aforementioned lease * * * ." It then provided that Article I of the lease, which described the land by metes and bounds, should be void, and another paragraph substituted therefor. The new Article I described by metes and bounds a tract 100 feet by 110 feet. The supplemental agreement also provided that Article XXVII of the original lease be void, and a new article substituted. This original article provided that in the event of a condemnation or taking of the demised premises, or part of them, the Lessee should be entitled to any and all rights to damages resulting therefrom. Under the substituted article, an excep-

tion was added, whereby the Lessors should have any and all rights to damages incident to condemnation of a ten-foot strip along Loch Raven Boulevard, described by metes and bounds. No change was made in Article XXVI or in any other article of the original lease. No consideration was stated in this supplemental agreement, but it was executed under seal, and acknowledged before a notary public on June 30, 1949. Crown Central entered into possession and constructed its filling station.

In June, 1955, the States Roads Commission put into effect its plan for widening the Boulevard in front of the property. The average width of the widening was 7.4 feet, but the strip taken was 10 feet and there were also certain limitations of access prescribed. In a letter dated September 6, 1955, Crown Central notified the lessors that it claimed to be entitled to a proportionate reduction of rent under Article XXVI of the lease. The reduction claimed was 10%, or $20.83 per month, based on a deprivation of use of a ten-foot strip along the Boulevard, amounting to 1,000 square feet, and an additional loss of 100 square feet "by the State changing the radius of the property". Replying to the demand, the lessors did not challenge the amount of the reduction, but claimed that the lessee was not legally entitled to any reduction, on the ground that their demise of an additional ten-foot strip at the rear of the lot had been a satisfaction in advance of any claim for reduction based on the widening of the Boulevard. They also threatened eviction proceedings unless the full amount of the rent was paid. Crown Central paid the full rent under protest, and filed an action at law for the refund of the alleged overpayment, a declaratory judgment construing the lease, and an injunction against the threatened eviction. The lessors filed a demurrer and answer, and the lessee moved for summary judgment. After a hearing at which testimony was offered, the court entered a judgment for rent overpaid and an injunction as prayed. From that action the appeal comes here.

The letter of Crown Central dated June 27, 1949, transmitting the supplemental agreement which was executed on June 30, 1949, was offered in evidence without objection.

The letter characterized the purpose or purport of the supplemental agreement as being "for an additional 10 feet of land to provide for the future widening of Loch Raven Boulevard * * * ." This characterization was accurate, for the supplemental agreement itself called for a demise of an additional ten-foot strip at the rear of the lot, and specifically described a ten-foot strip along the Boulevard and provided that damages incident to its taking should belong to the lessors. But it throws no light upon the interpretation of the leasing agreements, insofar as reduction of rent is concerned after the proposed taking.

The appellants contend that the court erred in sustaining an objection to a question put by counsel for the appellants, as to "the reason for the execution of the * * * supplemental agreement of June 30, 1949 * * * ." This was followed by a proffer "to prove that the sole purpose of the execution of the supplemental agreement of June 30, 1949, was to assure Crown Central Petroleum Corporation that it would lease a lot one hundred by a hundred feet * * * And * * * that it was not the intention of the parties that the provision of the original lease concerning reduction of rent would apply to the ten-foot [strip] to be taken by the State, but would only become applicable in the event more was taken." The court remarked that the terms of the documents were perfectly clear, and could not be varied by the parol evidence proffered.

The general rule is stated in *Restatement, Contracts,* Sec. 230: "The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean." This rule was cited with approval in *Insley v. Myers,* 192 Md. 292, 300. In that case it was held that clauses in a lease, recognizing a right to assign, and providing that all rights

and liabilities should "extend to" such assigns, were unambiguous and could not be varied by proof of an intention that in the event of an assignment the assignor should be relieved of liability for the payment of rent. The court also quoted a statement from *Rogan v. B. & O. R. R. Co.*, 188 Md. 44, 55, that "where a contract is plain and unambiguous, there is no room for construction, for the parties must be presumed to have intended what they expressed", and passages from 9 *Wigmore, Evidence* (3rd ed.), § 2472, and 3 *Williston, Contracts* (Rev. ed.), § 613. As *Williston* puts it (p. 1763): "It is often said that direct evidence of intention is admissible in case of equivocation * * * . But it should be observed that it is not primarily the intention of the parties which the court is seeking, but the meaning of the words at the time and place when they were used. The fact that the parties intended their words to bear a certain meaning would be immaterial were it not for the fact that the words either normally or locally might properly bear such meaning, and this is the basis of the rule in regard to equivocation." Other applications of the rule are illustrated in the cases of *Norman v. Century Athletic Club,* 193 Md. 584, 591; *Kikas v. Baltimore County,* 200 Md. 360, 365, and *Ray v. Eurice,* 201 Md. 115, 127.

The difficulty in the instant case is that the words of the lease and supplemental agreement, even when read in the light of the surrounding circumstances, cannot fairly be said to have a double meaning. The words of Article XXVI of the original lease, referring to the "entire area included in this demise", naturally referred to the demise of a lot 100 feet by 100 feet, but when a new Article I was substituted by the supplemental agreement, the entire area demised was increased to an area 100 feet by 110 feet and the words quoted became applicable, unmistakably, to the enlarged area. To restrict the application of the words to a lot 100 feet by 100 feet, rather than to a lot 100 feet by 110 feet, would involve a rejection of the words used to conform with an unexpressed and disputed intention. This exceeds the proper bounds of interpretation. The form of the proffer itself indicates that the lessors proposed to show an undisclosed

purpose and intention, and not merely to show circumstances that might bear upon the true meaning of the words used.

The appellants argue that "it was not contemplated by the parties that the ten-foot strip along Loch Raven Boulevard would be a part of the leased premises. That strip was reserved for the State." But the statement is not legally correct. Not only did the description by metes and bounds include this strip, but the lessee occupied it for a period of about six years under the lease. The appellants also make the point that there was no expressed consideration for the demise of an additional ten-foot strip at the rear of the lot. Even if the supplemental agreement had not been under seal, the alteration in Article XXVI, whereby the lessee surrendered its right to damages incident to the proposed taking in favor of the lessors, would constitute a good consideration for the demise of an additional ten-foot strip at the rear, even though there was no increase in the rental proportionate to the increase in the total area demised. Since the extent of the proposed taking had then been ascertained, the lessors might perhaps have insisted that Article XXVI be deleted or revised. But we cannot, under the guise of interpretation, rewrite the agreements because of a unilateral mistake or misunderstanding on the part of the lessors as to the plain meaning of the words used.

At the argument in this Court it was stated by the appellee that the appellants had claimed, and the Board of Property Review had allowed, damages to the appellants for the taking of the ten-foot strip, equal to the reduction in rental. It was suggested that this might render the case moot. Since the argument, the appellants have submitted a statement showing that on May 20, 1957, the Board passed awards allowing to the appellants damages totalling $4,666.67, representing a "10% rent reduction", on a taking of 1,100 square feet, calculated on the formula "$250 x 18⅔ years". It was pointed out that the award was not final, however, since either party could appeal from the award. Under the circumstances we think the case is not moot, but in view of our decision here, it may be that the appellants will recoup the rental reduction, although the point is not before us. In

any event, it would appear that the appellants have an anchor to windward, and in fact have taken a position, so far as the pending condemnation is concerned, at variance with their contention here.

*Judgment affirmed, with costs.*