285 F.2d 863
 ARC & GAS WELDER ASSOCIATES, INC., A Maryland Corporation, Appellee,
v.
GREEN FUEL ECONOMIZER CO., Inc., a New York Corporation, and National Surety Corporation, a New York Corporation, Appellants.
 No. 8186.
 United States Court of Appeals Fourth Circuit.
 Argued November 8, 1960.
 Decided December 30, 1960.
 
 Byron N. Scott, Washington, D. C. (Hilary W. Gans, Baltimore, Md., and Robert Day Scott, Washington, D. C., on brief), for appellant The Green Fuel Economizer Co., Inc.
 John Henry Lewin, Baltimore, Md. (David C. Green, Baltimore, Md., and Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellee.
 William L. Marbury and Mathias J. DeVito, Baltimore, Md., on brief amici curiae.
 Before SOPER and BOREMAN, Circuit Judges, and BRYAN, District Judge.
 SOPER, Circuit Judge.
 
 
 1
 This case concerns a dispute between a subcontractor and a sub-subcontractor as to which one of them was obliged to do certain work in the performance of a government contract. Blount Bros. Construction Company, a co-partnership of the State of Alabama, the prime contractor, entered into a general contract with the United States, acting through the Department of the Army, on June 30, 1955, to construct two stainless steel cloud chambers in a biological laboratory at Camp Detrick, Frederick, Maryland. On July 28, 1955, Blount entered into a subcontract with the Green Fuel Economizer Company, Inc., a New York corporation, to construct and deliver the cloud chambers in accordance with the plans and specifications of the general contract. On August 24, 1956, Green entered into a sub-subcontract with Arc and Gas Welder Associates, Inc., a Maryland corporation, to do part of the work which Green had contracted to perform. This contract was later superseded by a contract of November 1, 1956, between the same parties which changed to some extent the work to be performed by Arc. The instant suit was brought by Arc against Green, claiming that it had performed the work specified by the contract between them and also certain extra work ordered by Green, but had not been paid for its services. The case was heard before the District Judge sitting without a jury and resulted in a judgment for Arc in the sum of $80,778.20, from which Green has appealed. The exhaustive opinion of the District Judge is found in 182 F.Supp. 648, 651.
 
 
 2
 Cloud chambers are airtight rooms of stainless steel polished to a finish so smooth that there are no pits, cracks or crevices left in the walls in which germs may lurk after the chambers have been cleaned. Under the general contract the outer walls of the chambers were to be constructed of stainless steel plates 3/16ths of an inch in thickness, welded together and supported by carbon steel structural beams tack-welded to the outside of the plates. Each chamber contained a vertical baffle to be constructed of welded stainless steel sheets and a horizontal baffle of welded stainless steel plates.
 
 
 3
 The principal questions arising under the contract between Green and Arc relate to the kind of polishing required to be done by the general contract and which one of the subcontractors, Arc or Green, was obligated to do it under the contract between them. The following provisions of the specifications annexed to the general contract pertain to the character of the finish to be given to the surfaces of the chambers and are particularly pertinent, since they throw light upon the meaning of the terms used in both contracts:
 
 
 4
 "8-06 f. (1) All welds in the Cloud Chambers, Dissemination Room, Dressing Room E, and Air Lock No. 4 shall be ground smooth, and where No. 4 finish is hereinafter specified, shall be ground substantially flush with parent metal surfaces.
 
 
 5
 "8-06 f. (3) Inside Cloud Chambers `A' and `B', all stainless steel surfaces, including weld metal surfaces, shall be polished to a No. 4 finish without pits, cracks, or crevices. No. 4 finish shall include both faces and all exposed edges of baffle sheets and all exposed surfaces of baffle-supporting or reinforcing members.
 
 
 6
 "8-06 j. Final Polishing: Immediately prior to completion of the contract work, stainless steel surfaces with No. 4 finish shall be given a final recheck for pits, cracks, and crevices, and a final polishing."
 
 
 7
 As stated in the opinion of the District Judge, 182 F.Supp. 654, the August contract between Green and Arc called for the following work to be done by Arc:
 
 
 8
 "Complete erection, Fabrication and Testing of two (2) Stainless Steel Cloud Chambers in accordance with drawings (as per rider attached)."
 
 
 9
 The rider listed the drawings and, under the heading "Work," contained three paragraphs, two of which were identical with those quoted below from the rider to the November contract. The third paragraph read as follows:
 
 
 10
 "Polishing of the welds is not a part of this subcontract."
 
 
 11
 The August contract in fact did not require Arc to do any polishing and the stated consideration of $33,000 did not include any amount for polishing.
 
 
 12
 This contract was superseded by a contract between the same parties on November 1, 1956, which contained the following provisions describing the work to be done by Arc:
 
 
 13
 "Article I — Sub-contractor (Arc) shall furnish all labor and materials and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of the Contractor, and all work incidental thereto, namely:
 
 
 14
 Complete erection, fabrication, testing, and polishing of two (2) Stainless Steel Cloud Chambers in accordance with drawings (as per rider attached)."
 
 
 15
 * * * * * *
 
 
 16
 "Article IV — Sub-contractor shall make all alterations, furnish the material for and perform all extra work or omit any work owner or contractor may require without nullifying this agreement as a reasonable addition to or deduction from the sub-contract price hereinafter named and pro rata to the same. No changes are to be made, however, except upon written order from the Contractor and the Contractor shall not be held liable to Sub-contractor for any extra labor, materials, or equipment furnished without such written order."
 
 
 17
 * * * * *
 
 
 18
 "Article XV — The provisions of the attached rider complement and are a part of the printed contract."
 
 The rider provided as follows:
 
 19
 "Work
 
 
 20
 "1. All rigging work, erection, and welding necessary. Testing work necessary to make a complete and satisfactory job in accordance with the aforementioned drawings, plans, and specifications.
 
 
 21
 "2. It is understood and a part of this subcontract that the structural steel backing for the stainless steel plates will be delivered prefabricated and polished in accordance with the aforementioned drawings.
 
 
 22
 "3. Polishing of the welds is a part of this contract. All surfaces welded to be polished to a No. 4 finish with a maximum roughness finish tolerance allowable of 42 micro-inches."
 
 
 23
 The controverted questions relating to the respective duties of Arc and Green to polish the surfaces of the cloud chambers were not decided by the District Judge solely upon the terms of the written contracts. A great mass of testimony was taken in which the meaning of the terms was explained and additional oral agreements between Arc and Green were proved. When the contract of August 24, 1956, between Arc and Green was first offered in evidence, Green objected on the ground that the contract in suit was the later contract of November 1, 1956, but the court received the earlier contract in evidence and also additional evidence extrinsic to the contracts for the stated reason that the contracts were unclear in certain respects and hence additional evidence would be received with the right of the parties to move to strike the evidence before the court announced its final findings of fact. The ambiguities or uncertainties to which the judge referred related in part to the term "No. 4 finish" used in the documents and in part to what share of the work was to be done by Green and what share by Arc. On this appeal it is argued that the evidence should not have been received because the Arc-Green contract incorporated by reference the provisions of the Blount-Green contract with its riders, drawings, and specifications so that the two contracts constituted an integrated whole from which the respective obligations of Green and Arc should be ascertained in accordance with the rules laid down in the Restatement of Contracts §§ 226, 227 and 230, and 3 Williston on Contracts §§ 538 and 539, and in Insley v. Myers, 192 Md. 292, 64 A.2d 126.
 
 
 24
 It is, however, quite obvious that extrinsic testimony was required in this case. It is conceded by the appellant that the descriptive term No. 4 finish has no dictionary definition, and a large part of the testimony was therefore taken to ascertain the meaning given to the term in the industry in connection with the polishing of steel plates. The phrase relates to the surface smoothness to be given to the material which may be measured in micro-inches as, for example, a smoothness which does not exceed 42 micro-inches, which reveals no visible pits, cracks or crevices upon the surface. Green contends that (as used in the trade) a No. 4 finish does not possess such a high degree of smoothness as this and that its obligation under the contract with Arc was limited to the delivery of steel plates having only a No. 4 finish, whereas it was Arc's duty upon the delivery of the plates to polish them so that there would be no pits, cracks or crevices in the completed structure as required by the general contract. In this connection, Green points out that in the specifications of the general contract the term No. 4 finish is sometimes used alone and sometimes with the accompanying phrase "without pits, cracks or crevices", and hence draws the inference that the two phrases are not synonymous. The finding of the District Judge to the contrary on this point is set out in the following excerpts from his opinion (182 F.Supp. 651, 655):
 
 
 25
 "Underlying Facts
 
 
 26
 * * * * * *
 
 
 27
 "(2) No. 4 Finish
 
 
 28
 "Surface finishes on stainless steel sheet and plate are commonly sold by number designations, e. g. No. 1 finish, No. 4 finish, and No. 7 finish, the higher numbers indicating smoother finishes. They are not customarily sold in terms of a measurable smoothness in micro-inches. No. 1 finish, sometimes called "mill finish", is not polished at all. The leading steel mills regularly produce and sell stainless steel sheet and plate designated as having a No. 4 finish.
 
 
 29
 "It is understood in the industry that a No. 4 finish is a finish arrived at by grinding the surface of the plate or sheet with coarse abrasives and then polishing the surface with abrasives no coarser than 120 grit. Some mills use an even finer grit, but 120 grit is standard. While the various mills do not achieve precisely the same surface smoothness for all No. 4 finish and do not ordinarily produce or sell No. 4 finish in terms of a micro-inch measure or other specific measure of surface smoothness, the No. 4 finishes produced and sold by the various reputable mills fall within a range of surface smoothness which does not exceed 42 micro-inches. It is also recognized in the industry that to qualify as a No. 4 finish the surface of the plate must have no pits visible to the naked eye, and that all such pits are to be removed in the grinding and polishing operations necessary to produce a merchantable No. 4 finish.
 
 
 30
 "There is no material difference between a No. 4 finish on plate that has been polished to that finish by a mill and on plate that has been polished to that finish in the field, except that field-polished plate may be streaked in appearance. Nor is there any material difference between a No. 4 finish on stainless steel plate and a No. 4 finish on stainless steel sheet, although they may not look the same at a casual glance.
 
 
 31
 * * * * *
 
 
 32
 "Upon consideration of all the evidence, and weighing the credibility of the several witnesses, I find that the subcontract between Arc and Green was not intended to require Arc to do the final polishing or any other polishing necessary to create a No. 4 finish, without pits, cracks and crevices on the plates furnished by Ryerson."
 
 
 33
 This finding of the District Judge was adequately supported by the evidence detailed in his opinion and hereinafter referred to, and it follows that if Green had complied with its obligation to deliver to Arc stainless steel plates with a No. 4 finish, as defined in the judge's opinion, they would have possessed the smoothness required by the general contract and Arc would have had no occasion to polish them.
 
 
 34
 The ambiguity or uncertainty in respect to the character of polishing required by the general contract justified the taking of the evidence referred to, and there were also ambiguities in the Arc-Green contract which required additional testimony in order to ascertain the respective obligations of the parties. It will have been noticed that the August contract between Green and Arc contained the express provision that polishing of the welds was not a portion of the subcontract, whereas the third paragraph of the rider attached to the contract of November 1, 1956, between the same parties contained the express provision that polishing of the welds was a part of this contract. Uncertainty arises in this connection as to whether the insertion of this provision in the later contract indicates that Arc was to polish only the welds or was also to polish the stainless steel surfaces.
 
 
 35
 Moreover, the rider to the Arc-Green contract of November 1, 1956, is also ambiguous in its second paragraph. It provides that "the structural steel backing for the stainless steel plates will be delivered prefabricated and polished in accordance with the aforementioned drawings", but it does not state clearly whose duty it is to make the delivery and hence it might be contended that this was included in Arc's obligation. It is however conceded by Green, and it is shown by the testimony, that Green had the obligation to deliver not only the structural steel backing but also the stainless steel plates for the walls of the chambers, although by a mistake of the draftsman the plates themselves were not mentioned at all in the rider. Hence it is quite clear that the taking of testimony extrinsic to the documents was justified.
 
 
 36
 Upon an examination of the contracts and the additional testimony, which is adequately set out in the opinion of the District Judge, we are convinced that he was correct in his finding as to the meaning of the term "No. 4 finish" and also in his conclusion that, except for the polishing of the welds, Arc was not required to polish the surfaces of the plates but that Green was obliged to deliver the plates in such condition that they would need no further polishing, and that Green was also obliged to do the final polishing and recheck for defects immediately prior to the completion of the work, which is required by § 8-06j of the general contract but is not mentioned in the Arc-Green contract.
 
 
 37
 The testimony shows that in the industry a No. 4 finish means a smoothness which does not exceed 42 micro-inches, resulting in a surface without pits. This was brought out by investigations of the parties prior to making the subcontract, communications between the representatives of Green, Arc, Blount and the United States before and after the contract was signed, and by the testimony of experts. Bearing this finding in mind, it is plain that there is no room for the argument of the appellant that the parties to the general contract, by using the term No. 4 finish without the accompanying words, contracted for a finish less exacting than that contemplated by the usage of the industry. It is true that the parties to a contract may exclude from the agreement the application of a usage by contracting upon different terms, Restatement of Contracts § 247, Appelman v. Fisher, 34 Md. 540 and Applestein v. Royal Realty Corp., 181 Md. 171, 28 A.2d 830; but in the pending case the parties used terms which had a definite meaning in the industry and may not now be heard to say that they did not use the terms as the industry understood them.
 
 
 38
 We come then to the second important conclusion of the District Judge that Green was obliged, under the contracts, to polish the plates. In this connection, Green contends that the duty rested upon Arc because of the provisions of the Arc-Green contract, set out above, which require Arc to complete the following parts of the work of the general contract "and all work incidental thereto, namely: Complete erection, fabrication, testing, and polishing of two stainless steel cloud chambers in accordance with the drawings (as per rider attached)." Were it not for the rider Arc's duty to polish the walls would be clear, but the second paragraph of the rider, as Green concedes, requires Green to furnish the plates polished to a No. 4 finish in accordance with the general contract, and the third paragraph contains the sentence which, in express terms, seems to limit Arc's duty to the polishing of the welds only. Whatever doubt may be occasioned by these provisions is cleared up by weighty evidence which supports the conclusion that Arc was not required to polish the plates.
 
 
 39
 The general contract required the steel plates to be welded together so as to constitute the walls of the chambers. Arc was originally employed because its personnel was expert in welding although it had no knowledge of polishing steel plates. Doubtless, for this reason, the polishing of the welds, a necessary step in producing a smooth surface of the interior walls, was expressly declared in the August contract not to be an obligation of Are. Under the November contract, however, after representatives of Arc and Green visited various plants to learn how welds were polished, polishing of the welds was expressly included and the amount to be paid to Arc was increased by the sum of $16,000. Green contends that the new work to be done under the November contract included all of the polishing, but the evidence clearly indicates that the added compensation of $16,000 was so much less than the cost of polishing all the surfaces that it could not reasonably have included this work. The District Judge, in determining the fair value of Arc's work in order to arrive at the amount of the verdict, reached the conclusion, upon all of the evidence, that the polishing of 13,437 square feet of plate surface, including the removal of the paper attached to the plates when delivered, was worth $46,255.69 for labor alone, exclusive of profit and the cost of supervision.
 
 
 40
 Green itself recognized that the additional compensation of $16,000 agreed upon in the November contract was insufficient to pay for polishing the interior surfaces as well as the welds and entered into an oral agreement to pay Arc for polishing the plates as extra work when upon the delivery of the plates it was found that they were so far below the requirements of the general contract that additional polishing was necessary. Green, however, now contends that Arc's claim for extra work should be rejected because the orders for it were not in writing, as required by the Arc-Green contract. But it is clear, as the District Judge held, 182 F.Supp. 662, that Green waived the requirements of the contract in this respect in various ways, including the making of payments without formal written orders on other items of extra work and by statements made in correspondence between the parties. See Freeman v. Stanbern Const. Co., 205 Md. 71, 79, 106 A.2d 50.
 
 
 41
 Moreover, Green went on record about this time as to the extent of Arc's obligation to polish when he wrote to the supplier of the steel plates complaining of the pits and crevices in the surface. He said, as the District Judge points out, 182 F.Supp. 660:
 
 
 42
 "In order to remove these pits, our contractor has had to weld them shut and grind and repolish the surface. This has caused considerable extra work for our contractor, Arc & Gas Welder Associates, Baltimore. Their contract with us calls for grinding and polishing of the weld area. These pits occur most anywhere in the plates."
 
 
 43
 Green makes the additional argument that the court allowed an excessive amount for the extra work. The welding operations were accompanied by some discoloration and impairment of the mill finish of the plates — burn spots — and some scratches and dents in the surface of the plates were incurred during the storage of the plates, the removal of the paper and the erection. Green claims that these defects were due to bad workmanship on the part of Arc and hence it should not have been allowed any compensation for the extra work in remedying them. The argument is not tenable, since it was shown that the welding and the care of the plates were performed with due care and that the scratches and dents caused by the removal of the paper glued to the plates when they were delivered were caused by the unusual kind of paper used. In any event, these defects did not increase the cost of bringing the plates to the required polish, since the plates delivered by Green were below the contract requirements and the work needed to bring them up to standard would also have removed the defects which occurred during the erection of the chambers.
 
 
 44
 The judgment of the District Court is affirmed.
 
 
 45
 Affirmed.