**GLASSMAN CONSTRUCTION CO., INC.,**
a District of Columbia corporation,

v.

**MARYLAND CITY PLAZA, INC., et al.**

Civ. No. 20428.

United States District Court,
D. Maryland.

March 7, 1974.

Marvin P. Sadur, Sadur, Pelland, Braude & Caplan, Chartered, Rockville, Md., for plaintiff.

Charles R. Donnenfeld, Robert B. Hirsch, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., A. David Gomborov, Gomborov, Steinberg & Schlachman, Baltimore, Md., for defendant.

WATKINS, Senior District Judge.

This is an action for the balance claimed to be due on a contract price and for the claimed value of extra work performed in the construction of a shopping center. Plaintiff, Glassman Construction Company, is a District of Columbia corporation, with its principal place of business in a state other than the State of Maryland. Defendant, Maryland City Plaza, Inc., is a Maryland corporation; and defendants, Herbert H. Haft and Gloria Haft, are the owners of Maryland City Plaza and are citizens of the State of Maryland.

This Court has jurisdiction in the matter under 28 U.S.C. § 1332(a), by way of diversity of citizenship of the parties and the amount claimed.

On April 13, 1967, having learned that bids were being received on a shopping center to be constructed for defendant, plaintiff, through its president, Stanley Glassman, met with defendant, Herbert Haft, to discuss the possibility of a partnership agreement. At this meeting only vague reference was made to the existing leases for the stores to be built; however, defendant did mention that he would want a "turn-key" job. A preliminary figure of $1,050,000 for construction costs was mentioned by plaintiff.

Plaintiff then took the existing plans and specifications in order to prepare a firm estimate. After review of these plans, and upon initial receipt of some subcontractor bids, plaintiff determined that the center could not be constructed for the proposed price, and, as a consequence of this, a second meeting occurred. At this meeting the parties agreed to enter into a general contractor arrangement, rather than a partnership, if a price could be agreed upon. A subsequent figure of $1,225,000 was reached and agreed to.

Defendant's attorney drafted the contract; and, on May 1, 1967, the parties met to sign the instrument. Glassman claims this was the first time he saw the contract [although, apparently, a draft copy had been delivered to plaintiff's attorney earlier, for review]. At the meeting, several minor changes were made in the contract; however, there was no discussion concerning the leases or their content. The contract was then signed by the parties.

Among the provisions of the contract was the following clause:

8.7 The Contractor agrees to construct the entire Shopping Center . . . on a turn-key job basis; that is, the stores to be constructed by the Contractor shall be accepted by the tenants thereof and the requirements of the tenants in accordance with their leases shall be met. . . .

On May 8, plaintiff received from defendant copies of the leases as they then existed, with an accompanying letter that stated:

Enclosed herewith are the following copies of leases on the Maryland City Plaza which may be used only in con-

nection with co-ordinating tenants' lease requirements with the construction of the center. . . .

Plaintiff apparently never read the leases, either before signing the contract or upon their receipt on May 8. Glassman claims that he felt the requirements of the leases would be reflected within the plans and specifications he had been given at the original meeting. Upon receipt of the leases a week after signing the letter he claims he still considered the leases to be of no particular significance since he felt all of the lease requirements were incorporated within the plans. It was not until several months later, as revisions to the plans began to arrive, that plaintiff claims to have become aware that not all of the lease requirements were reflected within the plans. As plaintiff attempted to charge defendant for "extras" resulting from these changes and additions, it was discovered that defendant's concept of turn-key meant that the contract price also included subsequent negotiations between the owner and the tenants. From this point on plaintiff did all of its work under protest.

## CONTRACT INTERPRETATION

The contract on its face favors defendant's interpretation. In addition to article 8.7, which called for the requirements of the leases to be met, article 8.8 states:

> It is the understanding of the parties that the aforesaid Contract sum is a firm irrevocable price for the construction of the Shopping Center; . . . that except for the costs specifically hereinabove referred to as costs [1] which are excluded from this Contract that all costs incurred in the development of the Shopping Center shall be borne by the Contractor and not by the Owner.

Defendant argues that plaintiff's reliance solely upon the plans and specifications used for the estimates was unjustified because article 8.2 of the contract had a blank space for the insertion of dates and descriptions of drawings, plans and specifications, and no plans, drawings or similar documents were enumerated within this space, thus indicating that the plans were not final.

Plaintiff contends, however, that the contract should be limited to the plans received at the first meeting. Plaintiff further argues that the defendant had adequate time after the signing of the leases to incorporate the lease requirements into the plans used for estimating purposes, and, that defendant never gave any indication that these plans were incomplete. Plaintiff therefore argues it was justified in relying on the original plans as the final plans, and, plaintiff now claims $160,672.36 for work beyond that called for in the original plans, on the theory that this is "extra" beyond the contract price.[2]

Defendant early in the negotiations stated that he wanted a "turn-key" job; neither party throughout the preliminary stages sought or gave a definition to this term. Defendant apparently understood the term to mean a job whereby a flat fee was to be set and the contractor was to do *all* work required without additional charge. However, the trade usage of the term is not nearly so broad. As defined, a turn-key job is "a job or contract in which the contractor agrees to complete the work of building and installation to the point of readiness for operation or occupancy." *Webster's Third International Dictionary* 2468 (1963 ed.). In essence, this means a project in which all the owner need do is "turn the key" in the lock to open the building with nothing remaining to be done and all risks to be as-

---

1. Article 8.6 stated that the Contract Sum did not include the cost of land, cost of the storm sewer easement, cost of building permits, construction loan interest, points or other financing costs, bank interest, architect's fees and fees of mechanical engineers.

2. Defendant initially withheld $125,573 of the contract price. On May 18, 1972, it paid $96,704 of the contract balance due. Besides the claim for extras, plaintiff is also seeking the remaining $28,869 due on the contract price, plus interest.

sumed by the contractor. Judicial interpretations of the term have been consistent with this definition. See Robins v. C. W. Meyers Trading Post, Inc., 253 N.C. 474, 117 S.E.2d 438 (1960); Gnatt v. Van der Hoek, 251 S.C. 307, 162 S.E. 2d 267 (1968). Defendant's intention that all additional work, including changes and additions subsequent to the contract date, was to fall within the turn-key concept is of a wider scope than the trade usage. Ordinarily the industry understanding of the term would be controlling. Restatement, Contracts § 247(c) (1932). However, in the instant contract the term was expressly defined as requiring compliance with the tenant's lease requirements and bearing all costs, therefore controlling over the industry usage. Arc & Gas Welder Associates, Inc. v. Green Fuel Economizer Co., 285 F.2d 863 (4 Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 61 L. Ed.2d 241 (1961); Restatement, Contracts § 247, comment (d) (1932). At the same time the contract is self-limiting.

■ Article 8.4, which immediately precedes the provisions covering the turn-key concept, states that "[n]otwithstanding any other provisions of this Agreement and General Conditions to the contrary, the Contractor, Owner and Architect shall be bound by the following terms and provisions." This does not mean that the provisions of articles 8.4 through 8.11 should not be read in connection with the remainder of the contract, and where possible the contract should be read as a whole. Kelley Construction Co. v. Washington Suburban Sanitary Commission, 247 Md. 241, 230 A.2d 672 (1967); Restatement, Contracts § 235(b) (1932). Article 1.1.-2 of the General Conditions states that the "Contract Documents form the Contract," and that the "Contract may be amended or modified only by a Modification as defined in Subparagraph 1.1.-1." Article 1 of the contract states that the contract documents consist of "this Agreement, Conditions of the Contract . . ., Drawings, Specifications, all Addenda issued prior to execution of this Agreement and all Modifications issued subsequent thereto." Modification is defined as a written amendment signed by both parties, a change order, a written interpretation issued by the architect or a written order for a minor change in the work issued by the architect. In the standard AIA contract used by the parties article 12 provides for change orders; however, this article was excised with a notation to see articles 8.-4 through 8.9. These articles were provisions inserted by the parties, and there was no provision within these articles for change orders. The only reference to change is article 8.4, which provides the method for changes by the contractor without the owner's permission.

■■ In the absence of ambiguity, an objective test of determining the meaning of a contract by its terms, irrespective of the parties' individual subjective intents, should be applied. Slice v. Carozza Properties, Inc., 215 Md. 357, 137 A.2d 687 (1958). This objective intent is measured by the meaning a reasonably intelligent person with knowledge of the circumstances prior to and contemporaneously with the making of the integration, other than oral statements, would place upon it. Katz v. Pratt Street Realty Co., 257 Md. 103, 262 A.2d 540 (1970); Slice v. Carozza Properties, Inc., *supra.* The defendant's interpretation that the contractor must pay for all changes in the project, including those negotiated or agreed to subsequent to the contract date, is not revealed in the language of the contract. Reading the instrument as a whole, the contract is limited to the date of signing, with no provision for the owner to enlarge its requirements. The leases would be incorporated by reference as part of the contract, Ray v. Eurice, 201 Md. 115, 93 A.2d 272 (1952); 4 Williston on Contracts § 628 (3d ed. 1961). But subsequent agreements and changes between the land-

lord-owner and tenants would not be a part of the contract.[3]

### Extras

■ Plaintiff has charged defendant for a multitude of items it claims to be "extras," or items not on the original plans and specifications from which plaintiff made its bid.[4] At the trial, defendant's expert ably divided the extra work into five categories. These categories were: (1) "extras" which actually appeared on the original plans and specifications; (2) "extras" which, although not explicitly detailed in the original plans and specifications, were reflected in those plans, but required further detail; (3) "extras" required by the lease documents, at the time of entering into the contract; (4) revisions agreed to between the tenants and defendant before the May 1 contract date but received by plaintiff after that date; and, (5) revisions not reflected in the original plans nor in the leases, and agreed to by the tenants and defendant subsequent to the May 1 contract date.[5]

■ Clearly, plaintiff would be obligated as to items falling within the first three categories. The fact that plaintiff did not read the leases would not excuse plaintiff from performance. See Ray v. Eurice, 201 Md. 115, 93 A.2d 272 (1952). The contract stated that the tenants' lease requirements were to be met. Plaintiff entered into this contract with his eyes wide open, with all the then existing facts available to him. Plaintiff has been in the construction trade for a number of years, and entered into this agreement as an experienced businessman. The Court cannot now rewrite the contract under the guise of interpretation because of the unilateral mistake as to the plain meaning of the words used. Weber v. Crown Central Petroleum Corp., 214 Md. 115, 132 A.2d 857 (1957). Plaintiff would be responsible under the contract for only the requirements of the leases that were agreed to as of May 1. As to category two, plaintiff is held to those items that, through logical implication, would follow from the plans, although not shown. In instances where plaintiff was in the process of performing according to these inferences, but not to the quality or exact specifications that defendant desired, the change would be extra work for which defendant is obligated to compensate. For all essential purposes defendant did prepare this contract, and, therefore, any ambiguity that does exist in the contract is to be strongly construed against him. Kelley Construction Co. v. Washington Suburban Sanitary Commission, 247 Md. 241, 230 A.2d 672 (1967).

As for categories four and five, plaintiff would not be responsible for items

3. Further to buttress this interpretation is article 4 of the contract, which calls for completion of the project within one year of the contract date, failure to do so subjecting the contractor to liquidated damages. If the contract were to be interpreted as defendant would have it read, the contractor would be exposed to an unlimited, uncertain and unforeseeable obligation to satisfy unknown or undisclosed requirements of the tenants at no additional cost to the owner; completion to be accomplished within one year although changes resulting from landlord-tenant negotiations and agreements could continue indefinitely and quite possibly up to or beyond the required completion date. Such a result would certainly be both 'unconscionable and inequitable, and the recognized rule is that the interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh and unreasonable result. Cadem v. Nanna, 243 Md. 536, 221 A.2d 703 (1966); 4 Williston on Contracts § 620 (3d ed. 1961); Restatement, Contracts § 236(a) (1932).

4. In the pretrial order the parties stipulated that "the trial of plaintiff's claims for compensation over and above the contract price be limited to the question of liability, and a subsequent proceeding shall be held for a determination of quantum or amount of damages in the event the plaintiff is held entitled to compensation over and above the contract price." In accordance with that order this opinion is limited to the extent of liability, specific items and their fair value being reserved for later determination, if necessary.

5. Although defendant's category breakdown is adopted in this decision, this does not mean that the individual contents of each category, as presented by defendant's expert, are also adopted as listed.

of which he was not informed at the time the contract was entered into and had no means of discovering through the contract documents. The fact that the contract contained no provision for extra work would not proscribe plaintiff's entitlement to the fair value of work performed beyond the contract bounds. *See* S. D. Hicks & Son Co. v. J. T. Baker Chemical Co., 307 F.2d 750 (2 Cir. 1962) ; 13 Am.Jur.2d, Building and Construction Contracts § 19 (1964). Therefore, such items are clearly extras to be paid for by defendant.

■ A major extra, not falling within the above five categories, is the extension of the sewer line. At the time the contract was signed the path of the sewer was not known. The proposal was for two lines crossing an adjoining road. The pipe sizes were indicated as forty-two and thirty-six inch diameters. An extension of this sewer system was necessary but it was not known how far it would extend. Defendant stated that he wanted the price settled although the length of the line was not known. The two parties discussed the problem and after consultation by defendant with his engineer it was agreed that twenty dollars a foot was a "fair price" for any extension.[6] No discussion occurred concerning the diameter of the extension, and neither party was aware at the time that county regulations would require the pipe size to increase as it ran from the shopping center. After the location and plans were finally drawn the pipe extended approximately 800 feet beyond the road, and the size of the pipe had been increased to a fifty-four inch diameter at the road. Beyond the road it eventually evolved to an elliptically shaped pipe seventy-six inches by fifty-eight inches. There is no indication that either party contemplated such a variance in size. Defendant argues that regardless of the size of the pipe, under the terms of the contract plaintiff is entitled only to twenty dollars a foot. This was a fair price for an extension of forty-two inch pipe, but not for the larger pipe. From the testimony at trial, it appears that both parties implicitly assumed the extension would be of the same size as the on-site pipe. When in fact the extension required a larger, and, necessarily, more expensive pipe a mutual mistake of fact occurred. This mistake was of sufficient magnitude to justify this Court in ruling that on this specific provision no real contract was entered. Instead, in performing the installation of the sewer plaintiff would be entitled to the fair value of his work for the extension, on the basis of quantum meruit. 13 Williston on Contracts §§ 1557, 1575 (3d ed. 1970). *See also* Shapiro v. Solomon, 42 N.J.Super. 377, 126 A.2d 654 (Super.Ct.1956).

With regards to the claimed extras, therefore, plaintiff would be entitled to the fair value of the work performed on those extras to which it is entitled. This fair value would include reasonable overhead and profit. *See* Arthur N. Olive Co. v. United States, 297 F.2d 70, 73 (1 Cir. 1961) ; Continental Casualty Co. v. Schaefer, 173 F.2d 5, 8 (9 Cir. 1949).

### Delay

Defendant seeks, by counterclaim, damages incident to delay. Article 4 of the contract stated:

> The Work to be performed under this Contract shall be commenced immediately and completed March 1, 1968. If the Shopping Center is not completed . . . by May 1, 1968, the Contractor shall pay to Owner liquidated damages in the amount of $100.-00 per day for each day after May 1, 1968, that the Shopping Center has not been completed.

Within the General Conditions of the Contract for Construction, completion is

---

**6.** The contract provisions regarding this read:

8.10 The Contract Sum shall be increased by $20.00 for each linear foot of storm sewer in excess of 125 feet which the Contractor must construct on the north side of Maryland Route 198 . . . ..

defined to be when "the permanent lender accepts the construction of the Shopping Center without offset for construction items." The permanent loan was closed on September 25, 1968. Defendant is now seeking $15,100. in liquidated damages resulting from this delay.

 Plaintiff contends that the delay was due to defendant's actions and inactions. Plaintiff had commenced performance prior to the contract date; however, building permits, to be obtained by defendant, were slow in coming and as a consequence work was delayed. The first building permit was not delivered until two and one-half months after the project was started, and the last permit was not received until over four and one-half months after the work began. This slowness had a definite delaying effect on the work. Under article 4.7.1 of the General Conditions of the Contract, the owner was to acquire and pay for the permits. The delay in the location of the sewer line prevented plaintiff from paving the parking lot; as a result much of the work had to be done in the mud. The natural consequence of this was a bogging effect that impeded performance. Finally, the continual flow of revisions from the architect had an additional dampening on plaintiff's punctual performance.[7] Where one who is seeking to enforce a liquidated damages provision of a contract is responsible for the failure to perform or has contributed in part to it, the liquidated damages provision will not be enforced. United States v. Kanter, 137 F.2d 828 (8 Cir. 1943).

The better rule is that when the contractor has agreed to do a piece of work within a given time and the parties have stipulated a fixed sum as liquidated damages not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time, and that where such is the case, and thereafter the work is completed though delayed by the fault of the contractor, the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived.

5 Williston on Contracts § 789, p. 765 (3d ed. 1961), quoting United States v. United Engineering & Contracting Co., 234 U.S. 236, 242, 34 S.Ct. 843, 58 L.Ed. 1294 (1914).[8] Defendant was largely, if not entirely, at fault for the delay in completion; therefore, the liquidated damages provision of the contract will not be enforced.[9]

 As a result of this delay, plaintiff is also seeking damages it sustained. It is an implied provision of every contract that the other party promises to co-operate and failure to do so is a breach. 11 Williston on Contracts §§ 1296, 1316 (3d ed. 1968). *See also* George A. Fuller Co. v. United States, 69 F.Supp. 409 (Ct.Cl.1947). And, where a construction contract is breached by delay, the other party is entitled to recover the additional expenses occasioned thereby. Satine v. Koier, 223 Md. 417, 164 A.2d 913 (1960).[10]

Therefore, it is held that defendant's delays breached the contract, and pre-

---

7. Revisions were still coming in as late as February 6, 1968.

8. This has been the rule even for contracts requiring written application for extension of time and such application was not made, if the owner has caused the delay. Peter Kiewit Son's Co. v. Pasadena City Jr. College Dist. 59, 28 Cal.Rptr. 714, 379 P.2d 18 (1963).

9. This determination obviates the need to consider plaintiff's contention that the liqui-

dated damages provision is, in fact, a penalty and therefore not enforceable.

10. This may be tempered where the owner's delay is not caused by a lack of diligence, but was unavoidable. *See, e. g.,* Kehm Corp. v. United States, 119 Ct.Cl. 454, 93 F.Supp. 620 (1950). But in the instant action, defendant's delay was largely a product of a lack of diligence.

## 1162

vented timely performance by plaintiff. Defendant is not entitled to recover liquidated damages, and plaintiff is entitled to the loss, if any, it actually sustained as a result of the delay.

### Defects

 Defendant has also counterclaimed for various defects that allegedly occurred in the work performed by plaintiff.[11] In a counterclaim action the burden of proof is upon the defendant to establish the claim against the plaintiff. Brosius Development Corp. v. City of Hagerstown, 237 Md. 374, 206 A.2d 571 (1965). Defendant presented a battery of experts at the trial to testify as to the existence or possible existence of defects in the construction. However, the observations by these experts were made two years after completion of the project. No witness, other than defendant Herbert Haft, was offered who had observed any defects upon completion. It was admitted by many of the witnesses that after two years such items as cracks in the concrete and the requirement of exterior repainting were often due as the result of natural attrition. Defendant did not carry its burden on any of the items and, therefore, is entitled to no compensation for the alleged "defects."

 Besides the defects, defendant further seeks compensation for work performed by a tenant, allegedly to enable completion by the tenant's planned opening day. Giant Food was a major tenant of the shopping center. Defendant states that upon an inspection of the site Giant felt there were not enough electricians present to complete the electrical work in the store in time for the planned opening date, and that plaintiff agreed to compensate Giant for any

work Giant would perform to effect completion. Plaintiff, however, claims no knowledge of such agreement; that there were sufficient electricians on the site; and that the Giant electricians appeared approximately the same day the fixtures arrived for installation (such installation being Giant's responsibility to perform). Giant billed defendant for the work it performed, but apparently no mention of this billing was raised with plaintiff until two years later, as this litigation was developing. There has been no proof of an agreement between plaintiff and Giant, that it was necessary for Giant to do this work, or even that the work performed was work within plaintiff's responsibility. Therefore, again defendant has failed to carry its burden.

### Costs and Attorney Fees

 Plaintiff seeks an award of costs and attorney fees. In diversity actions the principles as to the allowance of costs deal with procedural matters and state law in and of itself is not controlling. Brown v. Consolidated Fisheries Co., 18 F.R.D. 433 (D.Del.1955); Barrett v. Rosecliff, 9 F.R.D. 597 (S.D. N.Y.1950). Federal rule 54(d)[12] would be applicable in this action, and, therefore, plaintiff, as the prevailing party, would be entitled to its costs.

 As for plaintiff's claim for attorney fees, the procedure is different, and in the absence of countervailing equitable principles, in a diversity action a federal court will apply state law with regard to the allowance of attorney fees. Travelers Indemnity Co. v. Rosedale Passenger Lines, Inc., 55 F.R.D. 494 (D.Md.1972). See also 6 Moore's Federal Practice ¶54.77 [2], p. 1712–13 (2d

---

11. The alleged defects consist of items such as bank erosion, faulty paving, peeling paint, brick cracking, missing ceiling tile, and cracking of the sidewalk.

12. Rule 54 reads in part:
(d) Costs. Except when express provision therefor is made either in a statute of the

United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.
. . .
Rule 54(d) Fed.R.Civ.P.

ed. 1974). The general Maryland rule is that, other than usual and ordinary court costs, the expenses of litigation— including legal fees incurred by the successful party—are not recoverable in a breach of contract action for damages. Empire Realty Co. v. Fleisher, 269 Md. 278, 305 A.2d 144 (1973); Freedman v. Seidler, 233 Md. 39, 194 A.2d 778 (1963). Except for appearance fees, no attorney fee is ever included in taxed costs unless there is a special statute authorizing it or special circumstances exist, such as where the parties to a contract agree on the payment of attorney's fees. Empire Realty Co. v. Fleisher, *supra*.

 Plaintiff, however, claims that defendant's counterclaims[13] were "groundless, vexatious and oppressive without substantive foundation." Maryland Rules of Procedure 604(b) provides:

> In an action or part of an action, if the court finds that any proceeding was (1) had in bad faith, (2) without substantial justification, or (3) for purposes of delay the court shall require the moving party to pay to the adverse party the amount of the costs thereof and the reasonable expenses incurred by the adverse party in opposing such proceeding, including reasonable attorneys' fees.

Although defendant has not been successful in its counterclaims that does not mean its actions were spurious and foundationless. Although not heavily weighted in defendant's favor, there was disagreement as to the issues and there was justification for litigation. Thus, plaintiff is not entitled to attorney fees under Maryland law.

 Under equity principles a federal court may award attorney fees even if state procedural rules do not permit it. This is because state law is not applicable to federal "equity" court procedure, and federal courts are therefore free to develop their own principles. Forest Laboratories, Inc. v. Formulation, Inc., 320 F.Supp. 211 (E.D.Wisc. 1970). This federal equity principle to award attorney fees is applied only in "exceptional cases and for dominating reasons of justice." Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). The facts of the instant action do not fall within this sphere of exceptional cases, and plaintiff is not entitled to attorney fees as a matter of equity.

## CONCLUSION

It is ordered that plaintiff is entitled to the $28,869 remaining due on the contract price, plus interest accruing from September 25, 1968. Plaintiff is also entitled to interest on the sum of $96,704 for the period of September 25, 1968, to May 18, 1972. Lastly, plaintiff is entitled to the fair value of the sewer addition (less the $15,980 previously paid), the fair value of "extra" work as earlier defined in this opinion, and to damages, if any, that it can prove resulted due to the delay, occasioned by defendant, in completion of the shopping center.

---

13. Besides the existing counterclaims for delay and damages, defendant originally had three additional counterclaims that were subsequently dropped or dismissed. These counterclaims were tortious interference with contract (which was withdrawn by defendant), breach of contract for failure to pay the subcontractors (which was also withdrawn by defendant), and abuse of process (which was dismissed for lack of supporting evidence).