## ORKIN ET UX. *v.* JACOBSON

[No. 117, September Term, 1974.]

*Decided March 5, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, ELDRIDGE and O'DONNELL, JJ.

*Arthur M. Wagman,* with whom was *Richard G. Kozlowski* on the brief, for appellants.

*Stephen A. Friedman,* with whom were *Feissner, Kaplan, Smith, Joseph, Greenwald & Laake* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

As the result of a tenant's having vacated leased premises in Virginia prior to the expiration of a lease, a Montgomery County trial judge (Moorman, J.) entered judgment in favor of appellee, Alec Jacobson (Jacobson), the landlord, against Leonard Orkin *et ux.* (the Orkins), guarantors. We shall vacate the judgment as it pertains to liability under the personal guarantee, but affirm the portion pertaining to liability on a promissory note.

Jacobson owned a store building in Vienna, Virginia, which he leased to certain individuals in 1967 for a term expiring October 31, 1972. With his consent, the lease was assigned on May 20, 1968, to Crest Enterprises, Incorporated (Crest). Ownership of the stock of that corporation apparently ultimately passed into the hands of the Orkins

since they were described in December, 1969, as "being principals" in it. In December, 1969, what was described as an "Amendment and Extension of Lease" was entered into between Jacobson and Crest. The agreement recited that "it [was] the desire of both . . . parties thereto to extend the term of said lease and to amend its provisions as [t]hereinafter set forth." By paragraph "A" "[t]he expiration of the term specified in Paragraph 1 [(of the original lease)] [was] . . . changed from the 31st day of October, 1972, to the 31st day of October, 1977." By paragraph "B" the minimum rental for the additional term was increased. Crest agreed by paragraph "C" to "install and maintain, at his [sic] expense, a 10-ton air conditioner and connect the same to the present ducts," with the further proviso that "[a]t the end of the lease term, title to said air conditioner sh[ould] vest in Lessor, free and clear of any lien or encumbrance." Appended to the amendment and extension was a guaranty agreement in the following language:

> "In consideration of the granting of the above by Lessor, we, being principals in Lessee corporation, do hereby, jointly and severally, personally guarantee that Lessee will perform all obligations required of it under said lease, as hereby extended and amended, during said extension period."

This was signed by the Orkins. Crest vacated the premises sometime between July 1 and July 20, 1972. Jacobson testified that the rent was in arrears for the month of July, 1972, and that "when [he] came up to Vienna about the 20th of the month, [the Orkins or Crest] had vacated the store." Jacobson rented to a new tenant who took possession September 1. This rental was for more money. He sued the Orkins on their guaranty agreement for accrued rent and the expenses of reletting. Judgment was entered in the amount of $1,900.00 against the Orkins after trial upon this count of the claim.

In June, 1971, an air conditioning unit was installed in the premises at a cost of $3,695.00. A promissory note was executed by the Orkins to the vendor, Associated Craftsman,

Inc., in the amount of $3,303.72 to pay for the unit. It was payable in 36 consecutive monthly installments of $91.77 beginning on July 10, 1971. The note was assigned by the vendor to United Virginia Bank of Fairfax. It is not a security agreement. The Orkins introduced into evidence their original contract with the vendor. It, also, is not a security agreement. Jacobson testified relative to the air conditioning unit:

> "The bank had requested from me at that time the tenant made application for a loan that I issue a landlord waiver.

> "Now, since the tenant was replacing a 15 ton unit which he was obligated to keep in good repair, I felt that it would be in my best interest to have this unit installed.

> "I granted the bank a waiver. When the tenant became in arrears, I realized that I was exposing myself to the possibility that the bank would cause the air conditioner to be removed from the property which would have left the property exposed to the elements because some of the machinery was on the roof.

> "The duct work was outside of the building and, if all of that was disconnected and removed, it would have been a very bad thing and would have made it impossible for me to rent to any subsequent tenant.

> "I therefore paid the note to the bank."

It was established that Jacobson paid the note and that it was assigned to him without recourse. Jacobson alleged in his suit against the Orkins that "after the [Orkins] had defaulted in payment on said Note, the then holder thereof advised [Jacobson] that unless the Note was paid the above-referenced air conditioning unit would be removed from the premises, as a result of which [Jacobson's] property in Vienna, Virginia would be substantially injured." The basis upon which the unit could be removed

was not established. Judgment was entered in favor of Jacobson against the Orkins in the amount of $1,954.38 on the note.

I

The Guaranty

The Orkins contend that "[t]he personal guarantee made by [them] applied only to the amended and extended lease period beginning November 1, 1972 and was not in effect during the period of default; therefore [they] are not personally liable for the rent due on the broken lease." Jacobson contends that Maryland Rule 886 is applicable and that the trial judge "was not clearly in error in finding that on July 1, 1972, the [Orkins] were guarantors of a lease, and amendment and extension thereto, between Crest Enterprises, Inc. and [Jacobson]."

We have adopted the objective law of contracts as enunciated by Chief Judge Brune for the Court in *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A. 2d 687 (1958):

"As we turn to the authorities, we may note first that the theory of 'objective law' of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake. *Ray v. Eurice*, 201 Md. 115, 93 A. 2d 272." *Id.* at 368.

*See also Monticello v. Monticello*, 271 Md. 168, 173, 315 A. 2d 520 (1974), and *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328, 301 A. 2d 12 (1973). In *Kasten*, after quoting from *Slice*, Judge Levine said for the Court:

"The cardinal rule in the construction and interpretation of contracts is that effect must be

given to the intention of the parties, unless it is inconsistent with some established principle of law, *Hardy v. Brookhart*, 259 Md. 317, 270 A. 2d 119 (1970); *Cadem v. Nanna*, 243 Md. 536, 221 A. 2d 703 (1966); *Schapiro v. Jefferson*, 203 Md. 372, 100 A. 2d 794 (1953). But, *where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed, Little v. First Federated Life*, 267 Md. 1, 296 A. 2d 372 (1972); *Kermisch v. Savings Bank*, 266 Md. 557, 295 A. 2d 776 (1972); *Devereux v. Berger*, 253 Md. 264, 252 A. 2d 469 (1969). And, when the language of a contract is clear, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant, *U.S.I.F. Triangle v. Rockwood Dev. Co.*, [261 Md. 379, 275 A. 2d 487 (1971)]; *Seldeen v. Canby*, 259 Md. 526, 270 A. 2d 485 (1970); *Katz v. Pratt Street Realty*, 257 Md. 103, 262 A. 2d 540 (1970). In addition to excluding Rod's 'understanding' or 'interpretation' as the test of what was intended under the contract, adherence to the latter principle also means that neither the 'understanding' of Annapolis Federal nor that of the scrivener is a proper standard." *Id.* at 328-29. (Emphasis added.)

Put in a slightly different way, as was said in *Devereux v. Berger*, 253 Md. 264, 269, 252 A. 2d 469 (1969), "Maryland contract law is to the effect that where a contract is plain as to its meaning, there is no room for construction and it must be presumed that the parties meant what they expressed," citing *Lawless, Adm'x v. Merrick*, 227 Md. 65, 71, 175 A. 2d 27 (1961); *Weber v. Crown, etc., Corp.*, 214 Md. 115, 121, 132 A. 2d 857 (1957); *Strickler Eng. Corp. v. Seminar*, 210 Md. 93, 100, 122 A. 2d 563 (1956).

Our predecessors in *Waters v. Griffith*, 2 Md. 326, 333, said that "[w]e must give, if we can, some distinct meaning

to every word employed in the contract . . . ." To like effect see 17 Am. Jur.2d *Contracts* § 259 (1964), citing, among other cases, *Nat. Fire Ins. Co. v. Crane*, 16 Md. 260 (1860):

"**§ 259. Giving effect to entire contract, and all its parts and language.**

"It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, must be given meaning, and force and effect, if that can consistently and reasonably be done. An interpretation which gives reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. So far as reasonably possible, effect will be given to all the language and to every word, expression, phrase, and clause of the agreement. No word or clause should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument. A construction will not be given to one part of a contract which will annul another part, unless such a result is fairly inescapable. Comparatively unimportant parts or provisions which may be severed from the agreement without impairing its effect or changing its character will be suppressed or subordinated if in that way, and only in that way, the agreement can be sustained and enforced." *Id.* at 660-62.

By analogy, in our construction of statutes we have consistently adhered to the proposition that "all parts of a statute are to be read together to find the intention as to any one part and that all parts are to be reconciled and harmonized if possible"; also, "that if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *See, e.g., Thomas v. Police Commissioner*, 211 Md. 357, 361, 127 A. 2d 625 (1956), and the many cases citing that decision since then including

*County Council for Montgomery County v. Supervisor of Assessments of Montgomery County,* 274 Md. 116, 332 A. 2d 897 (1975).

The Orkins guaranteed that Crest would "perform all obligations required of it under said lease, as [t]hereby extended and amended, *during said extension period.*" (Emphasis added.) The contract is not ambiguous. The only way that meaning can be given to each word used is to conclude that the Orkins assumed liability only for the extended term which was to begin November 1, 1972. To hold them liable for a default in the summer of 1972 gives no meaning to the words "during said extension period." If it were the intent of the parties that the Orkins' guaranty extend from its date in 1969, then the last mentioned words should not have been added because the performance of "all obligations required . . . under said lease, as hereby extended and amended" would have covered the situation. Accordingly, the trial judge erred in holding the Orkins liable under their personal guarantee.

## II

### Note

There was some suggestion here that the note was not endorsed by the United Virginia Bank to Jacobson.[1] As a matter of fact, the note filed as evidence in this case was endorsed by that bank to Jacobson. It is suggested that Jacobson is being unduly enriched by receiving the air conditioning unit as well as the balance due on the note. The short answer is that under the agreement between Jacobson and Crest title to the air conditioner was to vest in Jacobson "[a]t the end of the lease term . . . free and clear of any lien or encumbrance." The lease terminated when the tenant

---

1. Even if the note was surrendered to Jacobson without an endorsement as contended by appellants, Jacobson was a "transferee" under the Maryland Uniform Commercial Code, Code (1957, 1964 Repl. Vol.) Art. 95B, §§ 3-201 (1), 3-603 (2); and, consequently, he would have had all the rights of his transferor, including the right to sue on the note, unless barred by some other provision of law, as, for example, in Maryland by Code (1957) Art. 83, § 144, applicable to certain retail installment sales contracts.

moved out and Jacobson let the premises to another tenant. The premature termination was brought about by the action of Crest, of which corporation the Orkins said they were the principals. Thus, under the terms of the lease as amended, Jacobson was entitled to the air conditioner and, as assignee of the note, he was also entitled to collect from the Orkins the balance due on the note. Accordingly, the trial judge did not err in returning a judgment in favor of Jacobson on the note.

> *Judgment affirmed in part and reversed in part and case remanded for entry of a judgment in accordance with this opinion; one-half of costs to be paid by appellants and one-half by the appellee.*